## REAL ESTATE PURCHASE AGREEMENT

This Real Estate Purchase Agreement is made by and between DANA JARVIS, acting either on his own behalf ("Seller"), and FORK AND DAGGER, INC, an Arizona corporation, or its assigns ("Buyer"), upon the following terms and conditions. As used herein the term "date of this Agreement" shall mean the date that Seller executes this Agreement, as set forth beside Seller's name below.

A. Seller is the owner of that certain land and improvements located at 3523 Central Ave NE Albuquerque New Mexico (the "Real Property").

B. Seller's use of the Real Property has been as a restaurant and bar using furniture, fixtures, equipment and supplies (the "FF&E").

C. Seller is also the owner of a New Mexico Dispenser's License used in connection with the operation of Seller's restaurant and bar (the "Liquor License")

D. Buyer desires to purchase the Real Property, the FF&E (subject to physical inventory as provided by Seller and to be attached as Exhibit A), the Liquor License (collectively the "Purchased Assets").

E. Seller desires to sell the Purchased Assets to buyer on the terms set forth herein.

NOW THEREFORE IT IS AGREED:

### ARTICLE I
### AGREEMENT TO PURCHASE AND SELL: PURCHASE PRICE

2.1 Agreement to Purchase and Sell. Seller hereby agrees to sell and convey the Purchased Assets to Buyer, and Buyer hereby agrees to purchase and acquire the Purchased Assets from Seller for the consideration and subject to the terms, conditions and provisions herein contained.

2.2 Purchase Price. The Purchase Price to be paid by Buyer to Seller for the Purchased Assets is Seven Hundred Thousand Dollars ($700,000.00) (the "Purchase Price). The Purchase Price is allocated to the Purchased Assets as follows:

> Real Property –$500,000.00
> Liquor License–$200,000.00
> FF&E–$0

2.3 Payment of Purchase Price. The Purchase Price shall be payable to Seller, through Stewart Title of Albuquerque, L.L.C., 6750 Academy Road, NE, Albuquerque, New Mexico 87109 Attn: Michael N. Dayton, Senior Vice President, Telephone: (505) 828-1700, Facsimile: (505) 821-6065 (the "Escrow Agent"), as follows:

1



(a) Within three (3) days of the date that Seller executes this Purchase Agreement, Buyer shall deposit with the Escrow Agent the sum of $10,000.00 as Earnest Money, to be held in an interest bearing account. Buyer's Federal Tax I.D. Number is 85-1017896

(b) Buyer shall pay to Seller the sum of $500,000.00, plus or minus prorations, at the Closing in immediately available funds or by bank cashier's check.

(c) Buyer shall pay the balance of the Purchase Price upon confirmation that the Department of Licensing and Regulation, Alcohol and Gaming Division, has transferred the Liquor License to Buyer.

## ARTICLE II
## LIQUOR LICENSE

Seller is the owner of the Liquor License. Seller shall take all steps necessary to transfer the Liquor License to Buyer at Closing or as soon after Closing as possible. The Liquor License is currently in voluntary suspension in furtherance of the foregoing. Two Hundred Thousand ($200,000.00) of the Purchase Price, designated as consideration for transfer of the Liquor License itself, shall be retained by the Escrow Agent (or if the Escrow Agent declines to act as escrow agent for the portion of the Purchase Price allocable to the Liquor License) pending confirmation from the Licensing and Regulation Department, Alcohol and Gaming Division, that the Liquor License has been transferred to Buyer. Upon receipt of such confirmation, the Escrow Agent shall deliver the escrowed portion of the Purchase Price to Seller

Seller shall satisfy out of the Purchase Price all claims of creditors of Seller relating to the purchase and sale of alcoholic beverages at the Real Property arising prior to the Close of Escrow. Seller shall deliver to the Buyer and the Escrow Agent evidence in such form that such escrow holder may require showing that all applicable taxes relating to the Liquor License (including sales taxes, withholding taxes and franchise taxes) have been paid.

If, after the Closing Date (a) the Licensing and Regulation Department determines that the Liquor License is not transferable to Seller for any reason, or (b) the Liquor License is not transferred to Buyer by on or before the expiration of the 180-day period following the Closing Date, then in such event Buyer shall, at its sole option, be entitled to terminate its purchase of the Liquor License. In the event that Buyer elects to terminate its purchase of the Liquor License pursuant to its right to do so pursuant to this paragraph, it shall give Seller and the Escrow Agent written notice thereof. If Buyer terminates its purchase of the Liquor License the amount in the escrow established pursuant to this Article II shall be paid over to Buyer by the Escrow Agent and neither party shall have any further liability to the other under this Article.

If, prior to the Closing Date, Buyer determines in the exercise of its reasonable judgment, that the Liquor License is not transferable to Buyer or that Seller will be unable to convey the Liquor License to Buyer as required by this Agreement, Buyer's obligation to purchase the Liquor License shall terminate and the Purchase Price shall be reduced by the sum of Two Hundred Thousand Dollars ($200,000.00) Buyer's termination of its purchase of the Liquor License shall not prejudice



or have any affect on the purchase of the Real Property and the FF&E, and this Agreement as to the Real Property and FF&E shall remain in full force and effect.

## ARTICLE III
## SURVEY

3.1 **Survey.** Seller will, within ten (10) days after the date hereof, deliver to Buyer the most recent survey of the Property in Seller's possession. Buyer may, at Buyer's expense, obtain a current survey of the Real Property.

3.2 **Objections to Survey.** Buyer shall have until the expiration of the Feasibility Period to object to any matter shown on either the existing survey or the current survey obtained by Buyer. All matters not objected to in writing shall be deemed approved. Any objection shall be made as set forth in Sections 4.2, 4.3 and 4.4.

## ARTICLE IV
## TITLE INSURANCE

4.1 **Title Commitment.** Within ten (10) days of the date of this Agreement, Seller shall furnish Buyer an owner's Title Policy Commitment (the "Title Commitment") covering the Real Property issued by the Escrow Agent, together with true copies of all instruments referred to therein. Seller shall also obtain and deliver to Buyer a UCC lien search covering the FF&E and documentation from the Department of Licensing and Regulation confirming Seller's ownership of the Liquor License and relating to liens asserted with respect to the Liquor License (collectively the "Title Documents").

4.2 **Objections.** Buyer shall have until the expiration of the Feasibility Period to review the Title Commitment and all of the copies of instruments or documents (the "Title Documents") to be furnished to Buyer.

4.3 **Correction of Disapproved Items.** If Buyer disapproves any item set forth in the Title Documents, it shall so notify Seller and the Escrow Agent in writing before the expiration of the Feasibility Period. If Buyer determines that such item is reasonably capable of being cured or corrected to its satisfaction, it may request in its disapproval that such item be corrected or cured. In such case, the Seller shall, within ten (10) business days of the giving of such notice, notify Buyer and the Escrow Agent in writing as to the steps that shall be taken to correct or cure any such item and the time within which such steps shall be taken. Seller shall correct any disapproved item that can be corrected solely by the payment of money. Such corrections shall be made at Closing, out of the Purchase Price paid by Buyer. If not satisfied with such notice, Buyer may give written notice to the Seller and the Escrow Agent rescinding this Agreement, in which case this Agreement shall terminate. If no notice of rescission is given within such time, this Agreement shall continue in full force and effect. If, however, Seller gives notice that it proposes to correct or cure any disapproved item or items and such disapproved item or items have not been corrected or cured within the time set forth therein, Buyer may, at any time, give written notice of termination of this Agreement to Seller whereupon this Agreement will terminate.

4.4 **No Correction.** If Buyer disapproves any items set forth in the Title Commitment or the

3



Survey and Buyer determines that such items are not reasonably capable of being cured or corrected to its satisfaction, sets forth such determination in the notice of disapproval and gives notice of termination of this Agreement, then this Agreement shall terminate immediately upon the giving of such notice to Seller and the Escrow Agent, the Escrow Agent shall promptly return the Earnest Money to Buyer and the parties shall have no further obligations under this Agreement, except for Buyer's obligations pursuant to Section 5.3.

4.5 **Extension.** The Closing Date shall be extended to allow Seller a reasonable time to correct or cure disapproved items, in accordance with Seller's notice of intent to cure given by Seller under this Article, if such notice of intent to cure has not been disapproved by Buyer, provided, however, that Seller shall have no right to extend the Closing Date, unless Seller has given Buyer a timely notice of intent to cure which sets forth a required time period extending beyond the Closing Date, and Buyer shall not have given timely notice of termination of this Agreement.

4.6 **Monetary Liens and Obligations.** In the event that the Title documents disclose the existence of any monetary liens or encumbrances covering any part of the Purchased Assets, Seller agrees that such monetary liens will be paid and satisfied at Closing out of the Purchase Price.

4.7 **Permitted Exceptions.** Title exceptions shown in the Title Commitment and not objected to by Buyer shall be the "Permitted Exceptions".

## ARTICLE V
## CONTINGENCIES

5.1 **Delivery Items.** Within ten (10) days of the date of this Agreement, Seller shall deliver to Buyer copies of the most recent survey in Seller's possession; all agreements or contracts in effect relating to the operation of the Property; any environmental reports or audits for the Property in Seller's possession; and any architectural, mechanical, electrical, plumbing, and similar plans and specifications possessed by Seller relating to or used in the construction of the improvements on the Real Property. Seller shall also provide copies of the Liquor License and all documents and correspondence maintained by Seller relating to the Liquor License and the operation thereof.

4



**5.2 Contingencies.** Buyer's obligation to consummate this transaction is conditioned upon Buyer's review and acceptance in Buyer's sole and absolute discretion of: (i) the condition of the Property, and (ii) the feasibility study for Buyer's intended use. Accordingly, notwithstanding anything to the contrary contained in this Agreement, at any time during the period (the "Feasibility Period") commencing on the Opening of Escrow and terminating at 5:00 p.m., Albuquerque time, forty-five (45) days thereafter (the "Feasibility Termination Date"), Buyer shall have the right, at its sole discretion, to confirm that it will proceed with this transaction or terminate this Agreement for any reason whatsoever. Buyer may terminate this Agreement by giving written notice of Buyer's termination of this Agreement to Seller and Escrow Agent, upon which Escrow Agent shall return the Earnest Money Deposit to Buyer and Seller, Buyer and Escrow Agent and neither party shall have any obligation to the other. Buyer's failure to notify Seller Feasibility Termination Date that it will proceed with this transaction shall constitute Buyer's disapproval of the Purchased Assets and termination of this Agreement.

**5.3 Buyer's Inspection of Property.** Prior to the Closing, Buyer shall have inspected the Property to the extent Buyer deems necessary or desirable. Buyer and its employees and agents shall have the right and permission from the date hereof until the Closing Date to enter upon the Property or any part thereof at all reasonable times and from time to time for the purpose, at Buyer's sole cost and expense, of inspecting the same and making all tests or studies required in connection with the matters requiring Buyer's approval hereunder. Buyer shall indemnify and hold harmless the Seller from and against any and all claims or demands arising out of Buyer's inspection of the Property, including mechanic's or other liens or claims that may be filed or asserted against the Property or Seller by anyone performing any such work on Buyer's behalf. The indemnification by Buyer shall survive the Closing or the termination of this Agreement, as the case may be. Buyer shall be obligated to restore any damage to the Property to as near its original condition as may be feasible.

## ARTICLE VI
## SELLER'S REPRESENTATIONS AND WARRANTIES;
## SELLER'S OBLIGATIONS PRIOR TO CLOSING

**7.1 Seller's Representations and Warranties.** For the purpose of inducing Buyer to enter into this Agreement and to consummate the transactions contemplated hereby pursuant to the terms and conditions hereof, Seller represents and warrants to Buyer, as of the date hereof and, except as otherwise set forth herein, as of the Closing Date, as follows:

(a) **Title.** As of the date hereof, good and marketable title to the Purchased Assets is held by Seller, subject only to title exceptions to be shown on the Title Documents.

(b) **Legal Right.** On the Closing Date, Seller shall have full legal right and authority to sell, assign and convey the Purchased Assets to Buyer.

(c) **Violation of Law.** Seller has received no notice from any governmental authority that its operation of the Real Property and Liquor License is in violation of any applicable law, regulation or ordinance. To the best of Seller's knowledge, the Real Property, and the occupancy, operation and/or use of the Real Property, do not and will not violate any law, regulation or ordinance.



(d) **Legal Actions.** There are no actions, suits, or proceedings of any kind pending or threatened against the Seller which relate to the Purchased Assets or against the Purchased Assets, and if any such action is filed or threatened, it shall be identified to the Buyer in writing within five (5) days of the date of Seller's first knowledge thereof

7.2 **"AS-IS" Nature of Sale** Buyer acknowledges and agrees that except for the specific warranties and representations set forth in Section 7.1, Seller has not made, does not make and specifically negates and disclaims any representations, warranties, promises, covenants, agreements or guaranties of any kind or character whatsoever, whether express or implied, oral or written, past, present or future, of, as to, concerning or with respect to (A) the value, nature, quality or condition of the Property, including, without limitation, the water, soil and geology, (B) the income to be derived from the Property, (C) the suitability of the Property for any and all activities and uses which Buyer may conduct thereon, (D) the compliance of or by the Property or its operation with any laws, rules, ordinances or regulations of any applicable governmental authority or body (E) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property, or (F) any other matter with respect to the Property; and specifically, that Seller has not made, does not make, and specifically disclaims any representations regarding compliance with any environmental protection, pollution or land use laws, rules, regulations, orders or requirements, including solid waste, as defined by the U.S. Environmental Protection Agency Regulations at 40 C.F.R., Part 261, or the disposal or existence, in or on the Property, of any hazardous substance, as defined by the Comprehensive Environmental Response Compensation and Liability Act of 1980, as amended, and regulations promulgated thereunder  Buyer further acknowledges and agrees that having been given the opportunity to inspect the Property, Buyer is relying solely on its own investigation of the Property and not on any information provided or to be provided by Seller.  Buyer further acknowledges and agrees that to the maximum extent permitted by law, the sale of the Property as provided for herein is made on an "AS IS" condition and basis with all faults.

7.3 **Survival.** The representations and warranties set forth in this Article shall be continuing and shall be true and correct on and as of the Closing Date with the same force and effect as if made at that time, and all of such representations and warranties shall survive the Closing.

## ARTICLE VIII
## CLOSING

8.1 **Closing.** Provided that all of the terms and conditions of this Agreement shall have been fulfilled prior to or on the Closing Date (as hereinafter defined), the closing of title to the Property pursuant to the terms and conditions of this Agreement (the "Closing") shall take place at the office of the Escrow Agent in Albuquerque, New Mexico, on or before the thirtieth (30th) day following expiration of the Feasibility Period, or at such other place, time and date as Seller and Buyer may agree (said date is herein referred to as the "Closing Date")

8.2 **Seller's Obligations at the Closing.** At the Closing, Seller shall deliver to Buyer all of the following:

(a) **Deed**  A good and sufficient Warranty Deed (the "Deed") conveying to Buyer marketable

title to the Real Property, free and clear of all liens, encumbrances, conditions, easements, assignments, restrictions and rights of third parties, except for the Permitted Exceptions.

(b) **Title Policy.** A standard Owner's Title Policy (the "Title Policy") in the amount of the Five Hundred Thousand Dollars ($500,000.00), issued by the Escrow Agent, insuring marketable title in fee simple to the Property in Buyer, with exceptions only for the printed exceptions shown on the Title Commitment and the Permitted Exceptions.

(c) **Bill of Sale.** A Bill of Sale to the FF&E, in form approved by Buyer.

(d) **Other Documents.** Such other assignments and documents as may be required pursuant to the provisions hereof or mutually agreed by counsel for Seller and Buyer is to be necessary to fully consummate the transaction contemplated hereby.

(e) **Possession.** Seller shall also upon Closing deliver and convey possession of the Real Property and FF&E to Buyer.

8.3 **Closing Costs.** Costs of closing the transaction contemplated hereby shall be allocated between Seller and Buyer as follows:

(a) **By Seller.** Seller shall pay:

(i) the premium for the Standard Title Policy;

(ii) its share of prorated ad valorem taxes; and

(iii) one-half of any escrow fees or similar charges of the Escrow Agent; and

(iv) the costs of recording any releases of liens or encumbrances or any title curative or similar documents.

(b) **By Buyer.** Buyer shall pay:

(i) cost of any Title Policy coverage;

(ii) its share of prorated ad valorem taxes;

(iii) one-half of any escrow fees or similar charges of the Escrow Agent; and

(iv) the costs of recording the Deed and any other conveyance documents that Buyer may choose to record.

(c) **Shared Costs.** All other expenses incurred by Seller or Buyer with respect to the Closing, including, but not limited to, attorneys' fees of Seller and Buyer, shall be borne and paid exclusively by the party incurring the same, without reimbursement, except to the extent otherwise specifically provided herein.

7

DJ

8.4 **Protations and Adjustments.** Ad valorem and similar taxes (excluding assessments but including stand-by charges, if any) for the then current tax year relating to the Property shall be prorated as of the Closing Date. If the Closing occurs before the tax rate is fixed for the then current tax year, the apportionment of taxes shall be made on the basis of the tax rate for the preceding tax year applied to the latest assessed valuation of the Property, and when the tax rate is fixed for the tax year in which the Closing occurs, Seller and Buyer hereby agree to adjust the proration of taxes and, if necessary, to refund or pay such sums to the other party as shall be necessary to effect such adjustment. All unpaid assessments, if any, existing as of the Closing Date, whether due and payable before or after the Closing Date, shall be paid by Seller in cash at the Closing to the Escrow Agent for transmittal to the assessing entity

## ARTICLE IX
## DEFAULT

9.1 **Buyer's Default; Seller's Remedies; Liquidated Damages.** If Buyer is obligated to purchase the Property in accordance with the terms and conditions of this Agreement and fails to do so within the time provided herein, Buyer shall be deemed to be in default hereunder, and Seller shall be entitled to terminate this Agreement and to retain the Earnest Money as Seller's sole and exclusive remedy.

9.2 **Seller's Default; Buyer's Remedies** If Seller shall fail to meet, comply with or perform any covenant, agreement or obligation required of Seller within the time limits and in the manner required by this Agreement, or any representation or warranty of Seller has been breached on the Closing Date, Seller shall be deemed to be in default hereunder, and Buyer may at Buyer's sole option, either (i) enforce specific performance of this Agreement against Seller; or (ii) terminate this Agreement by written notice delivered to Seller on or before the Closing Date and receive a return of the Earnest Money.

## ARTICLE X
## REAL ESTATE COMMISSION

Seller, at Closing, shall pay a commission to Vince Marchindo Real Estate and Liquor License Brokerage and $M^2$, LLC (Richard Gallegos, Associate Broker) based upon 10 percent (10%) of the Purchase Price, plus NM gross receipts tax which will be split equally. The Managing Member of $M^2$, LLC is a licensed New Mexico real estate broker Each party represents and warrants to the other that no real estate broker or salesman has been employed in connection with this transaction. Seller shall indemnify and hold Buyer harmless from and against any and all claims for broker's commissions made by brokers or any other party claiming through Seller. Buyer shall indemnify and hold Seller harmless from and against any and all claims for brokerage commissions made by any party claiming through Buyer. The indemnities contained in this Article shall survive the Closing.

## ARTICLE XI
## GENERAL

8

11.1 **Additional Acts.** In addition to the acts and deeds recited herein and contemplated hereunder to be performed, executed and/or delivered by Seller or Buyer, Seller and Buyer hereby agree to perform, execute and/or deliver or cause to be performed, executed and/or delivered at the Closing or thereafter, any and all such further acts, deeds and assurances as Buyer or Seller, as the case may be, may reasonably require to evidence and vest in Buyer the ownership of and title to the Property and consummate the transactions contemplated hereunder.

11.2 **Applicable Law.** This Agreement shall be governed by and construed under and in accordance with the laws of the State of New Mexico.

11.3 **Assignment.** Any party shall have the right to assign its right, title and interest under the terms of this Agreement and the assignment shall be effective upon the non-assigning party's receipt of the assigning party's written notice of said assignment.

11.4 **Attorneys' Fees.** In the event that either party shall employ an attorney or attorneys to enforce any of the provisions hereof or to protect its interests in any manner arising under this Agreement, or to recover damages for the breach of this Agreement, the non-prevailing party in any action pursued in arbitration or in courts of competent jurisdiction (the finality of which is not legally contested) agrees to pay to the prevailing party all reasonable costs, damages and expenses, including attorneys' fees, expended or incurred in connection therewith.

11.5 **Authority** All parties to this Agreement warrant and represent that they have the power and authority to enter into this Agreement in the names, titles, and capacities herein stated and on behalf of any entities, persons, estates or firms represented or purported to be represented by such person, and that all formal requirements necessary or required by any state and/or federal law in order for Seller to enter into this Agreement have been complied with fully.

11.6 **Entire Agreement.** This Agreement embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior or contemporaneous Agreements, understandings, representations and statements, oral or written, are merged into this Agreement. Neither this Agreement nor any provisions hereof may be waived, modified, amended, discharged or terminated except by an instrument in writing signed by the party against which the enforcement of such waiver, modification, amendment, discharge or termination is sought and then only to the extent set forth in such instrument.

11.7 **Headings.** The headings contained in this Agreement are for reference and convenience purposes only and shall not in any way affect the meaning or interpretation hereof

11.8 **Interpretation.** Whenever the context hereof shall so require, the singular shall include the plural, the male gender shall include the female gender and the neuter and vice versa. The terms "include," "includes," "including," and similar terms shall be construed to mean "without limitation." All references to Sections, subsections, Exhibits and Articles shall be deemed references to Sections, subsections and Articles of this Agreement for all purposes.

11.9 **Multiple Counterparts.** This Agreement may be executed in a number of identical counterparts. If so executed, each such counterpart is to be deemed an original for all purposes

and all such counterparts shall collectively constitute one agreement, but in the making proof of this Agreement it shall not be necessary to produce or account for more than one such counterpart

11.10 **Notice.** Any notice, demand, approval or disapproval, consent or submission for approval or consent permitted or required hereunder (hereinafter, collectively, any "Notice") shall be in writing, and any such Notice shall be sent to the Seller or Buyer by registered or certified mail, return receipt requested, postage prepaid, or by Federal Express, UPS or other overnight delivery service, addressed to the addresses set forth on the signature page, or the same may be delivered by messenger at the same address or, if the same is a post office box, the last known address of the addressee. In the event such Notice is given or delivered by messenger delivery, the date of actual delivery shall fix the time thereof. In the event Notice is given or delivered by registered or certified mail, such Notice shall be deemed given or delivered three (3) business days after the date on which the sealed envelope containing the Notice is deposited in the United States mail, properly addressed and with proper postage prepaid.

11.11 **Parties Bound.** The terms and provisions of this Agreement shall inure to, extend to and be for the benefit of the heirs, successors, assigns, and legal representatives of the respective parties hereto though the foregoing shall not of itself be construed as authorizing any assignment hereof

11.12 **Right to Possession.** At the Closing and as a condition thereto, Buyer shall have the full and unrestricted right to possession of the Property subject to the Permitted Encumbrances and applicable laws and regulations of Governmental Authorities having jurisdiction over the Property and Seller shall execute such instruments and take such action as may be appropriate or required to assure to Buyer uninterrupted full possession of the same.

11.13 **Risk of Loss; Condemnation.** Risk of loss or damage to the Property by condemnation, eminent domain or similar proceedings (or deed in lieu thereof), or casualty, from the date hereof through the time of the recording of the Deed will be borne by Seller and, thereafter, will be borne by Buyer. Any damage to the Improvements shall be deemed to be immaterial, and shall not constitute a loss within the meaning of this Section 11.13  In the event of loss or damage to the Property by reason of condemnation or eminent domain proceedings (or deed in lieu thereof), if no parking areas have been taken and no means of access to the Property has been blocked or substantially impaired, the transaction contemplated hereby shall be consummated, and Seller shall assign to Buyer all condemnation awards. If any part of the parking areas on the Property have been taken by condemnation or eminent domain proceedings (or deed in lieu thereof) or if any means of access to the Property has been blocked or substantially impaired by any such taking Buyer may, at its sole option, elect to terminate this Agreement, and have no further obligations hereunder, or Buyer may consummate the transaction and receive an assignment from Seller at the Closing of all proceeds of insurance or condemnation awards attributable to such damage

11.14 **Severability.** If any provision of this Agreement shall, for any reason, be held violative of any applicable law, and so much of this Agreement is held to be unenforceable, then the invalidity of such specific provision herein shall not be held to invalidate any other provision herein which shall remain in full force and effect.

11.15 **Survival of Warranties.** The warranties, representations, covenants and other terms and provisions hereof shall survive the Closing and shall remain in full force and effect thereafter.

11.16 **Time; Entire Agreement.** Time is of the essence of this Agreement. The parties hereto expressly acknowledge and agree that, with regard to the subject matter of this Agreement and the transactions contemplated herein, (1) there are no oral agreements between the parties hereto and (2) this Agreement, including the defined terms and all exhibits and addendums, if any, attached hereto, (a) embodies the final and complete agreement between the parties, (b) supersedes all prior and contemporaneous negotiations, offers, proposals, agreements, commitments, promises, acts, conduct, course of dealing, representations, statements, assurances and understandings, whether oral or written, and (c) may not be varied or contradicted by evidence of any such prior or contemporaneous matter or by evidence of any subsequent oral agreement of the parties hereto.

11.17. **Expiration of Offer.** This Agreement will expire and cease to have any further force or effect unless executed by Seller by 5 o'clock p.m. on December ___, 2006 DJ

[Signature Page follows]

11

IN WITNESS WHEREOF, the parties hereto hereby execute this Agreement in multiple originals.

**BUYER:**                    **FORK AND DAGGER, INC.**

By _Jul Wyht_
Name: _Julian Wright_
Title: _CEO_

Date: ~~February~~ April 4th, 2007

4959 E Red Rock Drive
Phoenix, AZ 85018
Attn: Julian Wright
Telephone: (480) 239-7114
Facsimile (602) 374-3044

**SELLER:**

_Dana Jarvis_
Dana Jarvis

Date: ~~February~~ APRIL 2, 2007

Address:
_% of V. Mascarenas_
_911 Manzano NE_
_Albuquerque NM_
Telephone _505-256-0737_
Facsimile _____

12

DJ

### TITLE COMPANY'S AGREEMENT AND RECEIPT

On this **4th** day of ~~December~~ **April**, 2007, Stewart Title of Albuquerque, LLC, as the Escrow Agent in the foregoing Agreement, hereby acknowledges receipt of (i) a counterpart of this Agreement executed by Seller and Buyer and Buyer's Earnest Money deposit of ~~$10,000~~ **$50,000** and hereby agrees to act as Escrow Agent in strict accordance with the terms of this Agreement.

STEWART TITLE OF ALBUQUERQUE, LLC

By: _____
Name: Michael Dayton
Title: _____

check #1058
4/4/07
$50,000
TO Stewart Title
From Force & Dagger In

---

**WHISKEY WEST LLC**
4959 E. RED ROCK DR.
PHOENIX, AZ 85018-1820
480-239-7114

PAY TO THE ORDER OF: Stewart Title Co re — Force and Dagger, Inc.   DATE 4/4/07   $ 50,000.00

Fifty Thousand 00/100 DOLLARS

Bank of America

FOR: Harlow's down payment

1058

13