**Defendant Jarvis' Reply Motion to Dismiss**

**Exhibit A**

**Defendant Jarvis' Affidavit**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   Plaintiff,

v.                                                    No:   05-CR- 1849 (JH)

DANA JARVIS,

   Defendant.

## SEALED DOCUMENT

### AFFIDAVIT OF DEFENDANT DANA JARVIS IN SUPPORT OF HIS REPLY TO THE UNITED STATES' RESPONSE TO HIS MOTION TO DISMISS FOR IRREPARABLE STRUCTURAL ERROR & ADDITIONAL FIFTH & SIXTH AMENDMENT VIOLATIONS

I, Dana Jarvis, the defendant in the above titled case, do swear and affirm the following:

1.   In the time frame of late August 2005 through the beginning of September [D.J.] 2006, I was in pre-trial incarceration at a facility called RCC in Albuquerque, New Mexico on the charges in this present case.

2.   In RCC, the area where attorneys meet clients is such that there is regular conversation amongst inmates and attorneys passing through.

3.   I initially met Mr. Robert Gorence in this area. Mr. Gorence told me he wanted to get into this case. From the time of my arrest, I wanted nothing but to hire [D.J.] my own retained counsel. I had hired Cliff McIntyre to handle the forfeiture portion of my case and the United States held a hearing

1

and removed Mr. McIntrye sometime in late October 2005, so I was again seeking retained counsel when Mr. Gorence approached me.

4. On December 16, 2005 I met with Mr. Gorence at RCC. I had drafted a hand-drawn calendar and based upon this calendar showing Mr. Gorence on this date, I believe this to be so. I had a couple of quick, like ten minute conversations with Mr. Gorence and a couple of formal meetings.

5. In the first "meeting," it is my recollection that I met with Mr. Gorence in the holding room at RCC. The second meeting was in the glass attorney-client meeting room.

6. I believe the first "meeting" was about the cost of representation and the property and assets I could use to pay for counsel. Mr. Gorence had a copy of the indictment and we went through the property which appears from page eight to the end of the indictment. The government had a long list of property in the indictment and without saying exactly what Mr. Gorence and I discussed, I can say we went through the whole property list together. Mr. Gorence wrote notes about our conversation on the indictment. I have provided my attorneys the indictment with Mr. Gorence's notes written on it. I have this document because it was in the file Mr. Gorence returned to me that he had apparently kept on my case.

7. I believe the next meeting was on December 22, 2005. I had prepared a manila envelope of documents for Mr. Gorence and gave it to him at one of our meetings. As with the indictment, Mr. Gorence returned the manila envelope and documents to me when he returned my file sometime after the court refused to let him represent me. I made an inventory listing on the face of the manila envelope of the documents included in the envelope I gave to Mr. Gorence. I made a separate inventory mirroring the one on the face of the manila envelope so I could keep track of what I had provided to Mr. Gorence. My attorney Joe Romero presently has both of these items. The inventory lists 11 categories of documents, and some of the categories show the number of pages of each

2

document. From the number of pages shown, there were at least 29 pages, and in total, I would guess closer to 40 + pages of documents given to Mr. Gorence. Item numbers 1, 4, 6, 7, and eight on the inventory list were confidential work product, meaning my personal and secret evaluations of matters relating to the defense of my criminal case. Mr. Gorence talked to me about doing the motion he eventually filed on my behalf. Mr. Gorence took the manila envelope with the documents. He told me he was going out of town over the weekend but would work up a quote on my case, within maybe five or six days. An initial estimate in cost for his representation was given to me by Mr. Gorence.

8.  On January 9, 2007 Mr. Gorence and Mr. Kennedy filed a Motion on my behalf to get my assets released so I could get the money to hire them.

9.  I told lots of people that Mr. Gorence was my new attorney because I was very excited about them representing me.

10. In the January 19, 2007 hearing, Mr. Gorence represented me and spoke on my behalf on the motion they had filed for me to get my assets released. I was given a copy of the motion they filed and they accurately reflected my request to the Court that I wanted my property released as it was my desire to retain them in this case.

11. At the hearing, Mr. Gorence spoke to the Court on my behalf and tried to explain to the Court that everything I owned was frozen or had *lis pendens* filed against it. It was my understanding that if the motion Mr. Gorence filed on my behalf were granted I would use the released assets to pay these attorneys to represent me on this whole criminal case. At the hearing I was given a copy of the "Limited Entry of Appearance" they tried to file and I understood from it and from their filing of the Motion and being in court that day that they were representing me and that they would continue if the Motion were granted so I could pay them.

3

12. The court denied Mr. Gorence's motion and refused to allow them to represent me further. When Joe Romero was appointed as my CJA counsel I immediately asked him to get my assets released so I could hire counsel as I still wanted to hire Mr. Gorence. Joe Romero filed the motion I asked him to on February 3, 2006.

13. At some point, a month or so later, which date I do not remember, Mr. Gorence sent my file *but after the Court denied Romero's motion returned DJ* back to me. He returned all the documents I had given him and also documents reflecting telephone messages and emails he had received and or sent from his office when he was trying to get my assets released.

14. On May 12, 2006 I wrote a letter to Mr. Gorence. It was mailed on May 16th from the Detention Center. The letter was returned to me as Mr. Gorence would not accept it.

15. I later found out that Mr. Gorence had entered his appearance for my co-Defendant Dennis Wilson.

16. I have not signed any waiver of conflict presented to me by Mr. Gorence or any waiver regarding Dennis Wilson. I am familiar with a waiver of conflict because Cliff McIntyre explained all this to me when he tried to represent both me and Cathy Fitzgerald. In the hearing about Cliff's representation of both of us, the Court also explained the whole conflict issue to Cathy and I. Mr. Gorence never advised me like this, nor asked me to sign a waiver of conflict regarding Dennis Wilson. I have never waived any conflict regarding Dennis Wilson. I have never received any letter from Mr. Gorence telling me he would not or was not representing me.

FURTHER AFFIDANT SAYETH NAUGHT.

_____
Dana Jarvis

STATE OF NEW MEXICO    )
                       )  ss.

4

COUNTY OF TORRANCE            )

_____/s/ Dana Jarvis_____
Dana Jarvis

SUBSCRIBED AND SWORN TO before me this 1 day of November, 2007.

_____/s/_____
Notary Public

My Commission Expires:

    5-4-11

5