# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                                       Cr. No. 05-1849 JH

DANA JARVIS,

                Defendant.

## AMENDED[1] SEALED ORDER AFFIRMING MAGISTRATE JUDGE'S RULING

This matter comes before the Court on Defendant Dana Jarvis' ("Jarvis") Appeal from the Magistrate Judge's Order [Doc. 1165] Denying Disqualification of His Former Counsel, Robert Gorence, as Counsel for Co-Defendant Wilson, filed December 26, 2007 [Doc. 1183].  On January 15, 2008, the United States filed a response in opposition to Jarvis' Appeal [Doc. 1193].  After considering the law and the arguments, the Court finds that Chief Magistrate Judge Garcia's determination is not "clearly erroneous or contrary to law" and therefore, will affirm Judge Garcia's ruling.

On November 29, 2007, Jarvis filed a Motion to Seal an attached Motion to Disqualify Gorence from representing co-defendant Dennis Wilson.  [Doc. No. 1144.]  This was Jarvis' first and only effort to disqualify Gorence from representing Wilson.  On December 7, 2007, this Court granted

---

[1]This Order was originally filed and assigned a document number [1216] on February 7, 2008.  However, a Notice of Electronic Filing (NEF) was not properly generated in connection with that filing.  The inadvertent omission of the NEF is hereby corrected through this amendment.

the motion to seal [Doc. No. 1157], and Jarvis re-filed the *ex parte* sealed motion to disqualify, with

exhibits, on December 10, 2007. [Doc. No. 1161.] On December 14, 2007, Judge Garcia denied

Jarvis's motion to disqualify Gorence from representing Wilson. [Doc. No. 1165.] This Appeal

followed.

Jarvis argued in his motion to disqualify that Gorence has a conflict of interest in representing

Wilson, after having engaged in communications with Jarvis at an earlier date about possibly

representing Jarvis. Judge Garcia determined that, while an attorney-client relationship arose

between Jarvis and Gorence, Jarvis knowingly and voluntarily waived any conflict of interest. In his

Appeal, Jarvis argues that he did not waive the conflict of interest.

## LEGAL STANDARD

In accordance with 28 U.S.C. § 636(b)(1)(A), the Court referred Jarvis's motion to disqualify

Gorence to the magistrate judge for resolution. [Doc. No. 1157.] Federal magistrate judges may

hear and determine any pretrial matter pending that is not dispositive of the case and issue a written

order stating the decision. Fed. R. Civ. P. 72(a).

This Court has jurisdiction to review the decision of a magistrate judge on a non-dispositive

motion in accordance with Fed.R.Civ.P. 72(a) and 28 U.S.C. § 636(b)(1)(A). On review of a

magistrate judge's ruling, the reviewing judge does not substitute her judgment. Rather, the Court

must sustain a magistrate judge's ruling unless it finds that the ruling is "clearly erroneous or contrary

to law." Fed.R.Civ.P. 72(a); 28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th

Cir.), *cert. denied*, 522 U.S. 914 (1997). In other words, the Court is required to defer to the

Magistrate Judge's ruling unless the Court, after viewing the record as a whole, is left with a "definite

and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847

F.2d 1458, 1464 (10th Cir.1988); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948). In this district, the Honorable Leroy Hansen described the "clearly erroneous" standard as requiring a magistrate's decision to strike us as more than just maybe or probably wrong but, rather, to smell like "a five-week-old, unrefrigerated dead fish." ADS Financial Services, Inc. v. United States, 1997 WL 374757 at *2 (D.N.M. Mar. 26, 1997) (*citing* Parts & Elec. Motors, Inc. v. Sterling Elec., Inc., 866 F.2d 228, 233 (7th Cir. 1988), *cert. denied*, 493 U.S. 847 (1989)). Magistrate Judge Garcia's ruling was not "maybe" or "probably" wrong, and it comes nowhere near Judge Hansen's description of smelling like a "rotten fish."

## PROCEDURAL AND FACTUAL HISTORY

In order to thoroughly analyze Jarvis's position and various arguments, the Court addresses some of the lengthy procedural and factual history of this case.

On October 27, 2005, over two years before Jarvis moved to disqualify Gorence, Jarvis appeared at a hearing concerning Attorney Cliff McIntyre's possible conflict of interest based on McIntyre's concurrent representation of Jarvis and another co-defendant in this case on issues of forfeiture. [Doc. No. 238.] During the hearing, the Court specifically discussed with Jarvis issues of conflict of interest and waiver. The Court issued an Order finding that a conflict of interest was likely to arise; therefore, both Defendants were to retain separate counsel and McIntyre could no longer represent Jarvis.[2] [Doc. No. 259.] Thus, from early in this case, Jarvis understood and was

---

[2] A number of attorneys have been assigned to Jarvis's case. Initial CJA counsel was Judy Rosenstein, who represented Jarvis beginning on about August 26, 2005 until January 19, 2006. Attorney McIntrye was retained as "forfeiture counsel" for about three weeks in October 2005, until the United States filed a Rule 44 motion. Attorney Hope Eckert was CJA appointed legal consultant on forfeiture issues from about November 2005 through April 2006 and was legal consultant during Mr. Gorence's short involvement. In January 2006, Gorence and Kennedy filed a motion to release assets on Jarvis's behalf, but the motion was stricken later because Rosenstein

aware of the possibility of conflicts of interest due to an attorney's representation of two co-defendants in the same case. [*See* Doc. No. 1109, Jarvis Aff. at ¶ 16.]

On January 9, 2006, while Jarvis was represented by appointed counsel, attorneys Robert Gorence and Paul Kennedy filed a motion on Jarvis's behalf requesting that his assets be released so that he could afford to retain private counsel, Gorence and Kennedy. [Doc. No. 314.] The motion stated that Jarvis desired to retain Gorence and Kennedy for his defense but defense counsel would need adequate funds to represent Jarvis. [Doc. No. 314, ¶ 6.] Subsequently, the United States moved to strike the motion on grounds that Gorence and Kennedy were not counsel for Jarvis, and that Jarvis already was represented by other counsel. [Doc. No. 324.] The Court agreed with the government's position, rejected the limited appearance by Gorence and Kennedy, and granted the government's motion to strike Gorence and Kennedy's motion. [Doc. Nos. 321, 327, 329.]

Shortly thereafter, on January 24, 2006, Joe Romero was appointed counsel for Jarvis as prior CJA counsel had withdrawn. [Doc. No. 333.] On February 3, 2006, Romero filed a Motion for Release of Funds on Jarvis's behalf. [Doc. No. 338.] Romero argued that the Court had recently declined to hear a motion to release funds "presented by Mr. Jarvis's prospective private attorneys." [Doc. No. 338, p. 1, 2, 7.]

On February 14, 2006, Jarvis filed a motion to end unconstitutional conditions of confinement and requested an expedited hearing. [Doc. No. 342.] Jarvis asserted that on February 7, 2006, he was placed in administrative segregation, without warning or explanation. Since being placed in

---

still represented Jarvis at that time, and because Gorence and Kennedy had failed to file a notice of appearance in violation of the local rules. On January 24, 2006, Joe Romero was appointed temporary CJA counsel and continued to represent Jarvis until recently. On December 26, 2007, Romero withdrew as counsel for Jarvis. On that same date, Attorney Jerry Walz was appointed counsel for Jarvis. On January 22, 2008, Walz withdrew as counsel for Jarvis. [Doc. No. 1161.]

administrative segregation, Jarvis was locked alone in his cell for 23 hours a day, allowed out for showers five days a week, and only occasionally permitted to review his case's discovery on a computer. Jarvis was not allowed to have telephonic contact with anyone but his attorney, Joe Romero.

On February 23, 2006, the Court heard argument on Jarvis's pending motions and later denied both motions. [Doc. Nos. 356, 373.] The Court noted Jarvis's position that administrative segregation had impaired his Sixth Amendment right to prepare his defense with effective assistance of counsel but observed that this issue apparently had been cured. Counsel for the government, at the February 23 hearing, assured the Court that Jarvis would be able to meet with his attorneys and the investigator in the future. [Doc. No. 373, p. 3.]

On April 25, 2006, co-defendant Wilson was added in a superseding indictment. [Doc. No. 414.] On May 5, 2006 (about five months after filing the motion to release assets on behalf of Jarvis), Attorney Gorence entered an appearance on behalf of Wilson. [Doc. No. 454.] All counsel of record, including Jarvis's attorney, Mr. Romero, received notice of this entry of appearance.

On May 27, 2006, Attorney Romero moved to reconsider the Court's Order denying Jarvis's motion to end administrative segregation. [Doc. No. 499.] Jarvis was placed in administrative segregation only two weeks after Romero was appointed counsel for Jarvis. While Jarvis was permitted access to Mr. Romero, Jarvis argued that the extreme restrictions placed on him in administrative segregation interfered with his ability to fully participate in his defense. Jarvis contended that the segregation "hobbled" his defense preparation and was "adversely effecting [his] mental health over a prolonged period of extreme isolation before his trial." [Doc. No. 499, p. 5.] Jarvis was restricted from sifting through voluminous discovery and consulting with the private

investigator. He also was unable to conduct private telephone calls with his attorney. Finally, administrative segregation was having damaging effects on Jarvis's psyche and physical health, to the point that Jarvis was impaired in his ability to effectively assist his defense team. [Doc. No. 499, p. 8.] The Motion stated that Jarvis required "oversight" of a psychologist and was currently treated pharmacologically for mental conditions.

On May 29, 2006, Jarvis moved to reconsider the Court's order denying release of funds. [Doc. No. 500.] The motion recounted the pertinent history, i.e., that the Court previously declined to hear a motion to release funds that was presented "by Mr. Jarvis's prospective private attorneys [Gorence and Kennedy]." [Doc. No. 500, p. 2.] Jarvis again argued the property in question should be released so that he could procure counsel of his choice.

On August 11, 2006, the Court denied the motion to reconsider regarding the release of funds but granted the motion to end the administrative segregation. [Doc. No. 654.] The Court noted that Jarvis had been held in administrative segregation since February 7, 2005.[3] At the August 11 hearing, a psychologist testified on behalf of Jarvis, stating that Jarvis had an "adjustment disorder with mixed moods and insomnia, and that Defendant's concentration and memory are impaired." [Doc. No. 654, p. 2.] The psychologist concluded that Jarvis's psychological disorder had worsened and his ability to participate meaningfully in his own defense had been hampered by conditions of confinement. The Court ordered that Jarvis be transferred to the general population in the prison facility. [Doc. No. 654, p. 3.]

On about September 1, 2006, Attorney Jody Neal-Post was appointed outside expert on forfeiture, replacing a previous attorney consultant. [Doc. No. 1161, ¶ g.] By mid-September 2006,

---

[3] This date should have read February 7, <u>2006</u>.

Ms. Neal-Post was signing pleadings on behalf of Jarvis as his attorney, along with Joe Romero. [Doc. No. 676.]

On September 1, 2006, Jarvis filed an interlocutory appeal regarding the Court's ruling on his motion to release funds. [Doc. No. 666.] The appeal included transcripts from various hearings, e.g., the January 19, 2006 hearing, when Gorence and Kennedy attempted to represent Jarvis on the motion to release funds. [Doc. Nos. 694, 695.]

On September 5, 2006, Jarvis filed an emergency motion to stop his transfer from the Regional Correctional Center ("RCC") (in Albuquerque) to Torrance County Detention Center (in Estancia, New Mexico). The government wished to transfer him so as to more effectively monitor Jarvis's telephone calls, which it could not do at RCC. Jarvis argued that this transfer would further interfere with his ability to prepare his defense and that it would terminate his relationships with psychologists at RCC. [Doc. No. 667.] The government contended that it needed to monitor Jarvis's phone calls due to continuing reports that Jarvis had a "hit" out on a DEA case agent. [Doc. No. 671.] The Court denied Jarvis's emergency motion. [Doc. No. 674, 675.]

On September 26, 2006, Jarvis filed an emergency motion for immediate re-institution of his prescribed medical regimen, including previously prescribed antidepressant and anti-anxiety medications. [Doc. No. 691.] Jarvis asserted that his medications had been abruptly halted upon his transfer from RCC to Torrance County and that the cessation of his "therapeutic milieu" had caused a "rapid and palpable deterioration in [his] physical and psychological well-being making it extremely

difficult for counsel to elicit Defendant's meaningful participation in his defense." Jarvis also asked that access to discovery by computer be restored immediately. [Doc. No. 691.][4]

At the end of October 2006, Jarvis joined in four motions filed by Gorence on behalf of Wilson. [Doc. Nos. 741, 742, 746, 747.] Attorney Neal-Post co-signed the joinder motions with Romero. On October 30, 2006, Neal-Post's status was changed to co-counsel for Jarvis. [Doc. Nos. 780, 1161, ¶ g.]

On February 6, 2007, Jarvis filed a motion to stay criminal proceedings pending a decision on his appeal as to the assets issue which implicated his choice of counsel. The Court granted the motion to stay. [Doc. No. 895.] Romero and Neal-Post signed this motion on Jarvis's behalf. They argued that the questions presented in the appeal included denial of Jarvis's right to counsel of his choosing and characterized the appeal as concerning and ultimately determining who Jarvis's counsel would be. [Doc. No. 895, p. 2.]

On February 9, 2007, the Tenth Circuit Court of Appeals granted Jarvis's request to supplement the record on appeal. Part of the supplementation included copies of the government's Motion to Strike the motion to release funds filed by Gorence and Kennedy in January 2006, and the Court's Order granting the government's motion to strike the pleading filed by Gorence and Kennedy. [Doc. Nos. 923, 324, 329.]

---

[4] The Court notes that in his Appeal of the denial of his motion to disqualify Gorence, Jarvis contends that the Magistrate Judge failed to review this pleading [Doc. No. 691] regarding Jarvis's mental state and that such omission was "clearly erroneous." [Doc. No. 1183, pp. 4-5.] There is no evidence or inference that the Magistrate Judge failed to note this pleading. Moreover, in Jarvis's motion to disqualify Gorence [Doc. No. 1161], although he argues his position that he was incapable of participating in his own defense due to conditions created by the United States "at the precise time Mr. Gorence entered for Mr. Wilson," Jarvis never referred to Doc. No. 691. If that document were key to the analysis of the motion to disqualify, surely Jarvis would have highlighted it, particularly in a case such as this with over 1200 docket entries.

On September 24, 2007, the Tenth Circuit entered judgment in favor of Jarvis on his appeal. The Circuit Court remanded directing the District Court to order lifted the *lis pendens* notices filed on Jarvis's properties located in Mora County, New Mexico. [Doc. No. 1065.] At a subsequent hearing on November 20, 2007, before this Court, Mr. Gorence testified that even if there had been no *lis pendens* on the Mora properties, their sale would not have produced sufficient funds to retain him. In other words, he would not have accepted representation of Jarvis even if the Court had earlier released the *lis pendens* on the Mora property.

On October 4, 2007, Jarvis filed a motion to dismiss for irreparable structural error. [Doc. No. 1076.] In the motion, Jarvis argued that the case should be dismissed with prejudice because of the erroneous denial of Jarvis's motion to release funds "for retained counsel." "The only remedy in these unique circumstances is dismissal with prejudice, in part due to the actual conflict of interests now preventing Mr. Jarvis's counsel of choice from ever representing him in this case." [Doc. No. 1076, p. 1.] In this motion, attorneys Neal-Post and Romero argued that Jarvis had wanted to use the properties in question to hire counsels Robert Gorence and Paul Kennedy. Jarvis attached transcript pages from the January 19, 2006 hearing in which both Gorence and Rosenstein stated to the Court that they believed Jarvis wanted to retain Gorence through using his own personal funds. Jarvis argued in the motion to dismiss that "Mr. Gorence has an actual conflict in this case preventing him from now representing Mr. Jarvis, that being Mr. Gorence's present representation of co-defendant Dennis Wilson." [Doc. No. 1076, p. 4.] While Jarvis filed this motion to dismiss in early October, he did not file the motion to disqualify Gorence until late November 2007/early December of 2007. [Doc. Nos. 1144, 1161.] Instead, it was Gorence, on behalf of Wilson, who first filed a

motion in late October 2007, asking the Court to determine whether a conflict existed. [Doc. No. 1098.]

Attached to Wilson's motion requesting that the Court determine whether a conflict existed was correspondence between Attorneys Gorence and Neal-Post. [Doc. No. 1098, Exhibits.] A letter to Gorence from Neal-Post, dated October 9, 2007, states that Jarvis was asserting his privilege of attorney-client confidentiality regarding Gorence's handling of matters on Jarvis's behalf. "Such matters include the actual, albeit brief, in court representation you provided at a hearing of January 19, 2006 . . . ." Mr. Gorence responded on October 11, 2007, disputing that any attorney-client privilege existed between himself and Jarvis. On October 11, 2007, Neal-Post wrote Gorence again, stating that "[w]hile we can understand your concern that Mr. Jarvis could raise issues regarding your present representation of Mr. Wilson, neither Mr. Romero nor I presently intend nor anticipate doing so." [Doc. No. 1098, Exhibits.]

In this Appeal, Jarvis argues that the Magistrate Judge's ruling was clearly erroneous or contrary to law because Jarvis could not have waived a conflict of interest during the eighteen months before he finally filed a motion to disqualify. He claims he was incapable of filing such a motion due to his mental incapacity and inability to have made a knowing and voluntary waiver of his right to protest a conflict of interest. In addition, Jarvis asserts that the Magistrate Judge's findings as to credibility and tactical decisions were clearly erroneous because there "is no controverting evidence in the record that Mr. Jarvis' counsels ever actually knew of the extent of Mr. Gorence's involvement as Mr. Jarvis' counsel." [Doc. No. 1183, pp. 6-7.]

## DISCUSSION

### I.    Preliminary Matters

First, while Jarvis set forth the appropriate legal standard that applies to the Court's review, he also argues that a comparison of the weight of the evidence placed into the record with the evidence accumulated by the United States and Wilson demonstrates that the Magistrate's ruling is "against the entire evidence." However, this is not the appropriate legal standard for review, as noted *supra* at pp. 2-3. The Court defers to the Magistrate Judge's ruling unless it is clearly erroneous or contrary to law, although it views the record as a whole.

Second, Jarvis argues that the Magistrate Judge and this Court, in different Orders, concluded that an "actual conflict" existed between Jarvis and Attorney Gorence. The Court observes that neither Order characterized the conflict of interest as an "actual" conflict.[5] In addition, neither Order discussed whether the conflict was a lesser or more severe type of conflict. Instead, both Orders merely acknowledged the existence of a conflict.[6] [Doc. Nos. 1138, 1169.]

Third, Jarvis mischaracterizes recent testimony given by Attorney Gorence during proceedings before this Court concerning Jarvis's Motion to Dismiss. [Doc. No. 1183, p. 3.] Jarvis argues that

---

[5] In the Magistrate Judge's later Order denying Jarvis's motion to disqualify Gorence, the Magistrate Judge characterized the conflict as a potential conflict. [Doc. No. 1165, p. 6.]

[6] The distinction does not always make a difference. An individual's right to effective assistance of counsel may be violated if the attorney has a potential conflict of interest that results in prejudice to the defendant or an actual conflict of interest that adversely affects the attorney's performance. The presumption in favor of an accused's chosen counsel could be overcome by either type of conflict. *United States v. Jones*, 381 F.3d 114, 119 (2d Cir. 2004), *cert. denied*, 543 U.S. 1072 (2005). *Jones*, cited by Jarvis, has little bearing to the case at hand because *Jones* involved a *per se* unwaivable conflict of interest. In *Jones*, unlike this case, the defendant's attorney and members of his law firm were likely to become the subjects of a grand jury investigation based on the attorneys' alleged criminal conduct related to that of the defendant's. Thus, the accused's attorney's self-interest in avoiding criminal charges or harm to his own reputation could influence every aspect of his representation of the defendant. Such is not the case here. The court, in *Jones*, also observed that if an attorney suffers from a lesser actual or potential conflict, the court may accept a waiver of the conflict. *Id.*

Gorence gave testimony against Jarvis and that Gorence cannot separate his status as "government witness" from his separate status as Wilson's counsel. Thus, it is Jarvis's position that an actual conflict exists that cannot be waived. Even if the conflict is characterized as an actual conflict, this does not mean it is a severe *per se* unwaivable conflict, similar to that at issue in *Jones*. In addition, the Court concludes that Gorence's testimony, under subpoena, at a November 20, 2007 hearing before this Court was not "testimony against Jarvis." Gorence was asked questions only as to "nonprivileged matters." [Doc. No. 1141.] The privilege does not apply to facts. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 164 F.R.D. 245, 248 (D. Kan. 1995) (discovery of facts from attorneys is permissible as facts are not protected by attorney-client privilege or work product). Gorence's testimony lasted about 14 minutes. Moreover, Gorence, under subpoena to testify truthfully in response to limited questions posed to him, did not become a "government witness" merely by answering factual inquiries. Nothing in his recitation was adverse to Jarvis. Gorence testified about the limited nature and extent of his dealings with Jarvis and also testified that he never reviewed nor received any confidential information regarding Jarvis.

The testimony provided by Gorence at the November 20, 2007 hearing does not transform counsel into a government witness against Jarvis, nor is it evidence of a *per se* unwaivable conflict, similar to that at issue in *Jones*, 381 F.3d at 119-20.

## II.    **Waiver/Delay**

Jarvis argues on appeal that he could not have made a knowing and intelligent waiver of the conflict of interest because Judge Garcia failed to take into account a docket entry [Doc. No. 691], regarding Jarvis's mental state. Jarvis asserts that this pleading demonstrated Jarvis was incapable of participating in his defense during the pertinent time period and incapable of waiving a conflict of

interest.  [Doc. No. 1183, pp. 4-12.]  Jarvis argues that he was "incapacitated" for an extensive period of months because of his mental condition and the unconstitutional conditions of solitary confinement.  Thus, he was incapable of making a knowing and voluntary waiver of his right to protest a perceived conflict of interest.  Accordingly, his motion to disqualify Gorence should not have been denied for delay.

The Sixth Amendment guarantees that the accused, in all criminal prosecutions, "shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. Amend. VI. Notwithstanding this guarantee, the United States Supreme Court recognized that the right to choose one's counsel is not absolute.  *Wheat v. United States*, 486 U.S. 153, 159, 108 S. Ct. 1692 (1988). The Sixth Amendment guarantees the accused an effective advocate, rather than the advocate of his choice.  *Id.*

The right to effective assistance of counsel also includes the right to be represented by an attorney free from conflicts of interest.  *See, e.g., Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097 (1981).  An accused may waive a conflict of interest so as to retain an attorney of his choosing, even though the right of waiver is not absolute.  *Wheat*, 486 U.S. at 160-62.  For example, some conflicts of interest are "per se unwaivable," particularly in cases where the attorney's self-interest in avoiding criminal charges or harms to his own reputation are enough to influence every aspect of his representation of a defendant.  *See, e.g., Jones*, 381 F.3d at 120;[7] Sapienza v. New York News,

[7] The Second Circuit Court of Appeals explained that an "actual conflict of interest" is found when the attorney's and defendant's interests "'diverge with respect to a material factual or legal issue  or to a course of action," or when the attorney's representation of the defendant is impaired by loyalty owed to a prior client.'"  *Jones*, 381 F.3d at 119 (internal citations omitted). Potential conflicts of interest are those where the interests of the defendant could place the attorney under inconsistent duties in the future.  *Id.*    In either case where there is an actual or potential conflict of interest, a court may accept the defendant's knowing and intelligent waiver of

Inc., 481 F. Supp. 676, 680 (S.D.N.Y. 1979). This category of cases presenting unwaivable conflicts, however, is "very narrow." *United States v. Perez*, 325 F.3d 115, 126 (2d Cir. 2003) (noting that unwaivable conflicts typically involve situations where the defense is "permeated" by counsel's interest in not being implicated in defendant's crime or in securing a large retainer by an adverse party).

A motion to disqualify counsel deserves serious, conscientious, and conservative treatment. *Koch v. Koch Industries, et al.*, 798 F. Supp. 1525, 1530 (D. Kan.1992). The Court has "substantial latitude" in deciding whether to disqualify an attorney based on a conflict of interest. *Wheat*, 486 U.S. at 163. Courts should impose the drastic measure of disqualification only when absolutely necessary. *Procter & Gamble Co. v. Haugen*, 183 F.R.D. 571, 574 (D. Utah 1998); *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993). "When a trial court mistakenly disqualifies a party's counsel . . . the court in essence permits the party's opponent to dictate his choice of counsel . . . . [T]his result is in serious tension with the premises of our adversary system." *Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 441, 105 S. Ct. 2757 (1985) (Brennan, J., concurring). The Court must be ever mindful of the possibility of misuse of disqualification motions for strategic reasons.

> When pondering the proper outcome for a specific case, courts must exercise extreme caution not to act under the misguided belief that disqualification raises the standard of legal ethics and the public's respect; the opposite effect is just as likely--encouragement of vexatious tactics, which increase public cynicism about the administration of justice.

*Carlyle Towers Condominium Assoc. v. Crossland Savings, FSB*, 944 F. Supp. 341, 345 (D.N.J. 1996) (internal citations omitted). In deciding whether a motion to disqualify was brought for

_____

his right to conflict-free counsel if the conflict is of a lesser or minimal nature. *Id.*

strategic reasons, the timing of the motion becomes an important factor. *Buckley v. Airshield Corp.*, 908 F. Supp. 299, 307 (D. Md. 1995) (internal citations omitted).

The issue raised in this appeal is not whether an attorney-client relationship existed or whether a conflict of interest attached; instead, the question is whether the Magistrate's Judge's ruling that Jarvis waived the conflict by delay in promptly raising the issue is clearly erroneous or contrary to law.

In determining the issue of waiver by delay, some courts employ an analysis of five factors:

(1)  length of delay in bringing the motion to disqualify;

(2)  whether the movant was represented by counsel during the delay;

(3)  when the movant learned of the conflict;

(4)  why the delay occurred;

(5)  whether disqualification would result in prejudice to the non-moving party.

*Rohm and Haas Co. v. American Cyanamid Co.*, 187 F. Supp. 2d 221, 229  (D.N.J. 2001) (internal citations omitted.)

> [A] finding [of waiver] is justified . . . when a former client was concededly aware of the former attorney's representation of an adversary but failed to raise an objection promptly when he had the opportunity.  In [this] circumstance, the person whose confidences and secrets are at risk of disclosure or misuse is held to have waived his right to protection from that risk.

**(1)      Length of Delay:**

As early as 2005, Jarvis became conversant with the law of conflicts of interest in relation to representation of co-defendants in the same case.  [*See* Doc. No. 1109, Jarvis Aff. ¶ 16.]   In May

2006, Gorence entered his appearance on behalf of Wilson. Jarvis delayed 18 months before he filed a motion to disqualify Gorence in late November 2007/early December 2007.

Even if Jarvis could credibly establish he was totally incapable of assisting with his defense[8] from February 2006 until August or September 2006 , this does not explain why he did not raise a conflict issue in late 2006. Counsel's speculation that a conflict of interest would not have been the first thing on Jarvis's mind when he was released from administrative segregation is unpersuasive. Throughout 2006, Jarvis filed several motions and an appeal concerning his continuing intention to retain private counsel of his choosing. [*See* Doc. Nos. 338, 500, 666.] Thus, retaining private counsel was on Jarvis's mind, and he had to have known that his counsel of choice was representing a co-defendant.

In addition, Jarvis does not contend that he failed to learn of Gorence's representation of Wilson until 2007, nor could he do so. In October 2006, he joined in four motions filed by Gorence on behalf of Wilson. [Doc. Nos. 741, 742, 746, 747.] Moreover, Jarvis's attorney Joe Romero, with whom Jarvis was in steady contact in 2006, received Gorence's entry of appearance in May 2006, just as all counsel of record did.

Further, this Court already determined that Judge Garcia did not commit clear error in ruling that Jarvis had waived the potential conflict of interest through unreasonable delay. [Doc. No. 1169.] In the Court's Order denying Wilson's motion to reconsider the Magistrate Judge's "findings and recommendations," the Court stated:

> . . . the finding that a conflict of interest existed but was waived by
> Defendant Jarvis, is not clearly erroneous. As discussed in greater

---

[8] Jarvis failed to do so. He brought forth no objective medical evidence showing that he was "incapacitated" or totally unable to assist his counsel with his defense during any period.

detail in the Magistrate Judge's ruling on Defendant Jarvis's Motion to Disqualify, Jarvis delayed seeking disqualification of attorney Gorence and also joined with Wilson in several motions filed on his behalf by attorney Gorence, and disqualification at this point in the proceedings would be prejudicial to co-defendant Wilson. The Court finds no clear error in the Magistrate Judge's finding of waiver.

[Doc. No. 1169, p. 3.]

A delay of 18 months is significant, particularly in a complex case such as this, involving multiple counts and defendants. Already over 1200 docket entries have been filed. *See Redd v. Shell Oil Co.*, 518 F.2d 311, 315 (10th Cir. 1975) (finding that "the late filing [of the motion to disqualify] fully justified the summary rejection of the motion").

(2)    **Legal Representation:**

Jarvis was represented by counsel throughout the period in question. Romero represented Jarvis from mid to late January 2006 until late December 2007. In September 2006, Neal-Post began working with Jarvis on issues of forfeiture and entered an appearance as co-counsel to Jarvis in late October 2006. Thus, during some of the pertinent time frame, two attorneys represented Jarvis.

(3)    **Identification of Conflict and Reasons for Delay:**

Jarvis and his attorneys dispute when they learned of the conflict. As noted previously, Jarvis conceded that the Court explained "the whole conflict issue" to Jarvis in 2005. [Doc. No. 1109, Jarvis Aff. ¶ 16.] Thus, Jarvis understood what a conflict was and the use of written waivers. [*See id.*]. Yet, Jarvis now inexplicably contends he could not have known of Gorence's possible conflict and would not have made it a priority during a time when he was in administrative segregation and was supposedly "incapacitated." This position is not believable. For example, Jarvis acknowledges he wrote Gorence a letter and that the letter was returned to Jarvis because Gorence "would not accept it." [Doc. No. 1109, Jarvis. Aff., at ¶ 14.] Jarvis mailed this letter to Gorence the same month Gorence entered an appearance on behalf of Wilson. Indeed, he wrote the letter to Gorence several weeks after Gorence's entry of appearance. While Jarvis does not specify when he knew Gorence entered an appearance on behalf of Wilson, Jarvis stated he learned of Gorence's representation of Wilson at some point. [Doc. No. 1109, Jarvis Aff., ¶¶ 14, 15.]

After viewing the whole record, the Court is not left with a definite and firm conviction that Judge Garcia committed clear error when he rejected Jarvis's argument that Jarvis was so incapacitated he was unable to file a timely motion to disqualify. While counsel argued that Jarvis was impaired, there as no finding that he was diagnosed with an "incapacity" or determined

"incapacitated" by a medical professional. [Doc. No. 499, pp. 8-9.] Indeed, counsel argued that the administrative segregation "had created a state of emotional isolation that makes it increasingly difficult for Defendant Jarvis . . . to concentrate and focus." [Doc. No. 499, p. 9.] Counsel did not contend that Jarvis was unable to concentrate. Moreover, Jarvis clearly had the capacity to write a letter to Gorence in May 2006. [Doc. No. 1109, Jarvis. Aff., ¶ 14.]

In addition, the Court made no findings that Jarvis was incapacitated or incompetent. [*See* Doc. No. 654.] The Court noted the uncontradicted evidence that Jarvis's psychological disorder had worsened and his ability to participate meaningfully in his own defense had been "hampered."[9] [Doc. No. 654, p. 2.] Even though Jarvis had been held in disciplinary segregation for over 60 days, the government intended to keep Jarvis in administrative segregation for the foreseeable future. The Court concluded *not* that Jarvis was "incapacitated," but that Jarvis had demonstrated that the current terms of his confinement were interfering with his Sixth Amendment rights.

Further, nothing in the record indicates Jarvis was unable to work or communicate with his attorneys. Indeed, his attorneys continued to file pleadings on his behalf. Rather than being unable to assist in his defense, the record shows that Jarvis was engaged and competently assisting his attorneys. He clearly cooperated in approving legal motions and in providing information to his attorneys.

Jarvis's attorneys similarly argue that they did not know of the conflict or the extent of the conflict until much later. Yet in May 2006, Jarvis, through counsel, filed a motion to reconsider a Court Order and recounted the history involving Gorence's motion filed on Jarvis's behalf in January

---

[9] As pointed out by the government, Jarvis' "adjustment disorder" was diagnosed eleven weeks before he was transferred to administrative segregation.

2006. Jarvis's attorney, Joe Romero, argued that the Court previously declined to hear Gorence's motion to release funds that was presented by "Jarvis's prospective private attorneys." [Doc. No. 500.] It simply defies credulity to believe that Jarvis's attorneys were unaware of Gorence's appearance on behalf of Wilson in this same time frame or the possibility of a conflict of interest if they believed one existed.

In his affidavit, Jarvis noted that he had given Gorence certain documents when he first met with Gorence in late 2005. Jarvis also kept an inventory of the documents given to Gorence and stated that his attorney Joe Romero had these items, which identified what documents had been given to Gorence. [Doc. No. 1109, Jarvis Aff., ¶ 7.] Based on the many pleadings filed by Romero that discuss Gorence's brief involvement and Jarvis's intention to hire Gorence, it is inconceivable that Romero did not consider the possibility of a conflict if one existed. If a conflict of interest were a genuine concern, that red flag should have gone up when Attorney Romero continued to make arguments regarding Gorence's involvement and Jarvis's ongoing desire to have Gorence represent him. Yet, Jarvis did nothing for a year and one-half.

In addition, in September 2006 Jarvis filed an interlocutory appeal, again detailing work done on his behalf by Gorence and Kennedy in January 2006. The appeal included transcripts from the January 19, 2006 hearing which Gorence attended.

Throughout early 2007, Attorneys Romero and Neal-Post filed pleadings and supplementation on Jarvis's behalf discussing Gorence's brief work for Jarvis and Jarvis's ongoing desire to retain private counsel. [Doc. Nos. 895, 324, 329, 923.] The claim that Jarvis was unaware that Gorence was representing Wilson defies logic and credibility. The Court reiterates that it is not left with a firm conviction that the Magistrate Judge erred. In view of the whole record, the Court defers to Judge

Garcia's conclusion that it simply was unbelievable that Jarvis's attorneys first considered a potential conflict of interest in mid to late 2007.

In the Appeal, Jarvis also challenges the Magistrate Judge's findings as to credibility of counsel based on the Court's implied reference to a stricken document [Doc. No. 314].[10] Judge Garcia found that the record is clear that Gorence and Kennedy attended a hearing on January 19, 2006 and were seeking to represent Jarvis at that time. [Doc. No. 1165.] The Magistrate Judge proceeded to note that Gorence's early involvement was part of the public record which surely current counsel reviewed. [Doc. No. 1165, p. 3.]

A review of the record demonstrates that there were a number of pleadings referring to Gorence's early involvement, *e.g.*, Doc. Nos. 314, 320, 321, 324, 327, 329. It cannot be believed that Attorney Romero took no notice of those pleadings when he began representing Jarvis only days after the January 19, 2006 hearing. Moreover, in subsequent pleadings, including appeals and motions to reconsider, Romero referred to these early motions and proceedings.

Even if true that Jarvis's attorneys never "actually knew of the extent" of Mr. Gorence's involvement [Doc. No. 1183] and assumed the conflict was waivable, arising from a short representation [Doc. No. 1156, at p. 5],[11] Romero was on notice of the possibility from the date he began representing Jarvis. Romero certainly had the necessary knowledge to discern the conflict of

---

[10] In his Order denying Jarvis's Motion to Disqualify, the Magistrate Judge did not specifically mention the stricken motion to release assets, filed by Gorence [Doc. No. 1165.]

[11] In his Appeal, Jarvis lays blame on the government, the Court and Mr. Gorence for "turning a blind eye" to the potential conflict of interest. Yet, at the same time, Jarvis's own attorneys, who were working closely with Jarvis, were not alerted to the potential conflict and claimed they did not have sufficient information to make this determination until late 2007. When Attorney Neal-Post wrote Attorney Gorence, suggesting that a conflict might exist, Gorence promptly asked the Court for a determination of a possible conflict.

interest issues.   He had ample opportunity to explore that possibility with Jarvis as early as May

2006, when Gorence entered an appearance on behalf of Wilson.[12]

### (4)        Prejudice to Non-Moving Party:

The Court must be ever vigilant in its examination of whether a party who files a

disqualification motion does so because of strategic or tactical decisions.  *See Richardson-Merrell,*

*Inc.*, 472 U.S. at 436 (expressing concern for the "tactical use of disqualification motions to harass

opposing counsel"); *Cox v. American Cast Iron Pipe, Co.*, 847 F.2d 725, 729 (11th Cir. 1988) (a

party may not delay filing a motion to disqualify for strategic purposes).

Upon a review of the whole record, the Court concludes that the Magistrate Judge's finding

that counsel apparently made a tactical decision to allow Gorence to continue as Wilson's attorney

in spite of a possible conflict was neither clearly erroneous nor contrary to law.  Indeed, a tactical

decision is made clear by Attorney Neal-Post's correspondence to Gorence, in which she stated that

"[w]hile we can understand your concern that Mr. Jarvis could raise issues regarding your present

representation of Mr. Wilson, neither Mr. Romero nor I presently intend not anticipate doing so."

[Doc. No. 1198, October 11, 2007 correspondence.]  Thus, even at that late date, Jarvis and his

attorney knowingly made decisions not to raise conflict issues.

At this point in the litigation, the Court concludes that disqualification of Gorence would

result in prejudice to the non-moving party, Wilson.  Gorence has been representing Wilson for over

a year now.  Undoubtably, Wilson has invested a substantial amount of time and money in the

---

[12] Jarvis's assertion that there is no evidence in the record supporting the Magistrate
Judge's declaration that Wilson "wishes Gorence to remain his counsel" is untrue.  Pleadings filed
by Wilson state otherwise.  [Doc. No. 1153.]

representation by private counsel. A number of substantive motions have been filed. To require

Wilson to obtain new counsel would cause further and significant delay, along with expense.

## CONCLUSION

The Court observes that this is not a case where the Magistrate Judge determined that the

motion to disqualify should be denied in view of only length of the delay. *See Buckley*, 908 F. Supp.

at 307 (discussing that mere length of delay should not be dispositive on question of motion to

disqualify). Here, in denying the Motion to Disqualify Gorence, Judge Garcia looked beyond the

mere length of delay and considered a number of factors, as identified *supra*.

In sum, the Court is not left with a "definite and firm conviction that a mistake was made" by

the Magistrate Judge. In addition, the Magistrate Judge's conclusion that Jarvis made a knowing and

intelligent waiver was neither clearly erroneous nor contrary to law, under the circumstances of this

case.

For the above-stated reasons, the Court affirms Judge Garcia's Order [Doc. No. 1165] and

denies Jarvis's Appeal of the Magistrate Judge's Order Denying Disqualification of Mr. Gorence as

Counsel for Co-Defendant Wilson.

**IT IS SO ORDERED**.

_____

**UNITED STATES DISTRICT JUDGE**