# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CR 05-1849 JH** |
| | ) | |
| **DANA JARVIS,** *et al.*, | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT JARVIS' OBEJCTIONS & EXCEPTIONS TO THE PRE-SENTENCE REPORT

COMES NOW Defendant Dana Jarvis, by and through his counsel of record, hereby files these objections and exceptions to the Pre-Sentence Report (PSR) after his counsel met with the United States and attempted a negotiated resolution regarding the Defendant's exceptions.   Undersigned counsel acknowledge that the Probation Officer did not have the benefit of any offense conduct statement by the Defendant prior to preparing the report, as the Parties were attempting to expedite the PSR and sentencing.   Agreed areas of amendment to the PSR and areas of disagreement are identified by Mr. Jarvis as follows.

1.      Page 4, ¶ 6:   The Parties agree that the second sentence should be amended to read: "The Superseding Indictment charged the same defendants, **except those who pled or were dismissed**…." *See Grand Jury Transcripts* 4/25/06 at 39:16-18 (AUSA Braun speaking).   Mary Cannant was in the original indictment.

2.      Page 5, ¶ 7:   The Parties agree that the first sentence should be amended to read: "The Superseding Indictment charges are identical to the Indictment**, except that**

**the time frame alleged for the conspiracy was extended from three years to fifteen years**."

3.    Page 5, ¶ 9: The Parties agree that the property forfeited is listed in paragraph 11 the plea agreement, not the PSR.

4.    Pages 6-8, ¶¶ 11-38 (Co-defendant information):  This section should be updated to include the sentences of several defendants who have been sentenced and those who have entered pleas of guilty and are awaiting sentence.  The list excludes CW1 and CW9, who were charged by information and pled guilty under different case numbers. Their plea and sentence information should be added into the PSR. For the Court's clarification and by agreement of the Parties, a "decoder" document identifying the confidential witnesses is filed as "*Sealed Exhibit.*"

### Offense Conduct:  Evaluation Parameters

It is crucial to note that a substantial amount of information in the report regarding offense conduct is based on statements by co-defendants, cooperating witnesses and confidential sources.  Some of this information consists of alleged facts which the government **expects** would be part of these individuals' sworn trial testimony, should they testify.   Another significant amount is gleaned from information obtained from cooperating witnesses and confidential sources that the government has no intention of presenting at trial, according to the *James* hearing materials. The three confidential sources have refused to testify or sign sworn statements and the government has stated that such confidential source information was used for investigative purposes only, perhaps indicating recognition that such information may not be reliable.

Now, however, these statements have been provided as factual material for

inclusion in the PSR. Many such witnesses were not involved in any manner with the DTO prior to 2002, and none can present reliable testimony about the total number or sizes of jobs, or money made during the entire period alleged. As there will be no trial in Dana Jarvis' case, these witnesses have not been nor will be subject to cross-examination, impeachment or to the crucible of an adversarial proceeding. Indeed, as the confidential sources remain unnamed, their backgrounds and motives remain unknown and their credibility cannot ever be tested in any manner.

Some of the witnesses have serious prior criminal convictions and most cooperated in order to eliminate being criminally charged or to obtain lower penalties for their own criminal behavior. Indeed, both CW1's and CW9's sealed plea agreements indicate dismissal or non-prosecution of federal offenses in other Districts. Such witness statements are often *per se* unreliable. The witnesses may well have motivations other than telling the truth, such as being owed money by Mr. Jarvis, a dislike of Mr. Jarvis, or obtaining monetary or other payments from the United States for inculpatory information about Mr. Jarvis. Often, their testimony is contradictory, confused and or inaccurate as a result of drug usage, mental conditions, and exacerbated by the passage of time requiring them to remember events over a decade old.

There is no evidence that the witnesses or sources were vetted in any manner to help determine their credibility. *See also* Exhibit B, attached to Mr. Reid's sealed motion to suppress wiretaps filed February 2, 2009, for discussion of United States' failure to properly vet confidential sources. Consequently, their statements contained in the PSR should be carefully scrutinized, as such witnesses frequently tend to diminish the seriousness of their own conduct while exaggerating that of the person against whom

they are cooperating.  These witnesses may not, in fact, provide under oath the same or even similar testimony as they provided to government agents and/or the U.S. Attorney. Yet it is these statements on which the government and the PSR rely to determine the scope of the offense, and therefore the guideline calculations. As the credibility of all these individuals is critical to the Court's determination regarding the imposition of a reasonable sentence, the Court should not merely accept the PSR offense conduct as true and accurate, but must weigh it carefully.  Suffice it to say that Mr. Jarvis does not agree with many of the statements and has identified numerous falsehoods and exaggerations by these witnesses.

Due process requires that that the information pursuant to 18 U.S.C. 3661 which this Court is allowed to consider as part of the sentencing process is first found "reliable" by a preponderance of evidence. *United States v. Kaufman*, 546 F.3d 1242, 1267-68 (10th Cir. 2008). The Court's reliability finding is sufficient if the Court explains the evidence upon which it "relies upon reaching those conclusions," and the specific findings are "particularized" such that the result is a "clear picture of the reasoning employed by the sentencing court." *Kaufman*, 546 F.3d at 1268, *citing United States v. Torres*, 53 F.3d 1129, 1143 (10th Cir. 1995).   Such findings will be difficult to make in this case, as the Court will likely neither see nor hear directly from any of these witnesses or be aware of their backgrounds and motivations.

5.    Page 8, ¶ 40:  The Parties agree that the language should be amended to read: "…laundering **money derived from or involved in the offenses** between 1990 and August 25, 2005."  This correction does not resolve the disputed amounts of marijuana or of money laundered; it simply clarifies that the only constitutionally reliable information

in the PSR as to amounts laundered is that *unknown amounts were laundered.*

Mr. Jarvis contests the government's calculations regarding the amount of marijuana involved in this conspiracy, as well as the amount of currency laundered. The information in the report comes from the United States which calculated the figures based on drug ledgers seized contemporaneously with Mr. Jarvis' arrest. *See Grand Jury Transcript 4/29/06* at 39:15-25, 40:1-25. The figures presume that the quantities of marijuana and the buying and selling prices noted in the ledgers remained the same throughout the fifteen year period of the conspiracy and that all gross income was laundered. This does not comport with the facts or case law.

The government acknowledged during the change of plea hearing that the DTO was not in business for several years in the 1990's. The government has also acknowledged that the amount charged to and by the DTO for its product increased over the years. Since the ledgers cover only the most recent years of the conspiracy, it is obvious that one cannot simply multiply the figures found in the ledgers by fifteen and come up with reliable figures. The grand jury transcripts demonstrate that was exactly what the United States did, and which guesstimated numbers the PSR continues to use. *Grand Jury Transcript 4/29/06, supra.* "The need to rely on an estimate is 'not a license to calculate drug quantities by guesswork.'" *United States v. Higgins*, 282 F.3d 1261, 1280 (10th Cir. 2002), *quoting United States v. Paulino*, 996 F.2d 1541, 1545 (3rd Cir. 1993).

It is clear that these figures are constitutionally unreliable, as the grand jury testimony resultant in the money judgment figure is based solely on the uncorroborated statement of a single cooperating witness, CW1, for whom the impeachment material is

so extensive and sensitive that it was released and remains under Protective Order of this Court. *See Giglio Discovery Release* for CW 1, dated September 27, 2007.  In *Ortiz*, the Tenth Circuit found that an estimated drug quantity for sentencing purposes in the absence of any seized drugs could not stand based solely upon the Agent's "testimony that he thought the informant had said that he had seen Defendant with some unknown quantity of marijuana on one occasion." *United States v. Ortiz*, 993 F.2d 204, 208 (10th Cir. 1993)("When choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity, a court must err on the side of caution."). The testimony here as to quantities of marijuana and money is no more reliable than in *Ortiz* and is, therefore, without sufficient indicia of reliability to allow the Court to make a finding of accuracy by a preponderance of evidence.

Additionally, like most businesses, the DTO had good years and bad years during the fifteen year span, and did not operate at all during several of those years.  Most of the organization's proceeds were used to pay for the marijuana, its employees and otherwise meet the operating expenses of the organization.  A relatively small amount, as noted in both Indictments, was allegedly laundered and Mr. Jarvis admitted in his plea to the largest dollar value of the individual counts, Count 26 ($1350.00).  Counts 4-23 of the Superseding Indictment all reflect the same payee, the same amount of funds and were paid around the beginning of each month noted.  These are, in fact, mortgage payments on the Bernalillo property paid directly from Mr. Jarvis' trust fund, which fund the government has allowed the Defendant to keep, as it is not a provably forfeitable asset. The three counts involving Santa Fe Consulting, 24-26, should be considered the only valid evidence of profit to Mr. Jarvis, as the term "proceeds" in the laundering statute as

to promotional money laundering [18 U.S.C. § 1956(a)] means "profits," not all the money received. *See United States v. Santos*, 128 S. Ct. 2020, 2025 (2008). The total amount in the three counts is merely $2750.00, or just **.0017%** of the amount alleged by the United States' uncorroborated and highly speculative grand jury testimony.   The Defendant avers that the government figures are seriously over-inflated and that the actual amount of marijuana and laundered funds involved in this case is far lower than that reflected in the PSR.  Mr. Jarvis' calculations of the figures, based on his knowledge of the DTO's operations between 1990 and 2005, are found in ¶¶ 61-62 of this pleading.

Despite the enormity of the government investigation over many years and involving the U.S. Attorney, DEA, FBI, FAA, Homeland Security and local police in New Mexico, Arizona, Colorado, Ohio, Indiana, New Jersey and elsewhere, all the seizures, arrests and search warrants netted less than 300 kilograms of marijuana and approximately $1.3 million dollars across almost forty defendants, sources and cooperators, according to the PSR. No large stashes of marijuana were ever located. Indeed, the ledger located in the Bernalillo house shows that one job entailed 930 pounds and the balance involved between less than 100 to just over 300 pounds, not the several thousand pound jobs alleged by CW1, on whose statements the government and PSR figures rely. While CW5's ledger indicates gross earnings of $1.7 million in one year, it is believed that he conducted his own drug trafficking business and was supplied by other organizations which had nothing to do this DTO. Overall, the PSR seizure figures represent a tiny fraction of what the government claims was involved and do not reliably corroborate the allegations made by cooperating witnesses and sources.  The figures in the report are merely significantly overstated conjecture and are insufficiently reliable to

meet due process requirements for consideration by this Court in sentencing.

6.      Page 8, ¶ 41:    The Parties agree that at the end of the paragraph, the following words should be added: "DEA subsequently refunded the money."  The United States acknowledges that the funds were returned to CW 4 after her attorney wrote a letter to the DEA; there was no further court action and no criminal charges were filed. Further, CW4 had sources of income other than from the DTO and paid for the attorney from the returned funds which was deposited in his/her personal bank account; CW4 paid personal income tax on it and used it to purchase a personal vehicle and other items, all facts noted in the discovery.

7.      Page 9, ¶¶ 44, 45:  These paragraphs should be excised from the report. The information comes from a confidential source, whose statements fail to meet the requisite level of accuracy required by due process. "Without good cause shown for the nondisclosure of the source's identity and sufficient corroboration by other means," the District Court cannot consider out of court declarations of unidentified sources.  *United States v. Hawkins*, 915 F.2d 1573 (6th Cir. 1990)("Table case", unpublished).

8.      Page 9, ¶ 46:   This paragraph should be removed. Neither named individual was charged criminally in this matter.  The only evidence that the money seized belonged to Mr. Jarvis comes from "several [unidentified] cooperating witnesses" and their 'knowledge' is likely based on rumor and (perhaps multiple) hearsay and is therefore unreliable.

9.      Page 9, ¶ 47:  For the reasons stated above, this paragraph should also be removed from the report.  The person believed to be CS2 was not associated with the DTO and all of his/her information is hearsay, likely from another individual who also

was not charged in this case.  The information has no indicia of reliability.

10.     Page 10, ¶ 48:  Mr. Jarvis denies that his home in Bernalillo was used as a stash house and such reference should be removed.  Only an insignificant or personal use amount of marijuana was located in that house at the time of his arrest.  Mr. Jarvis continues to object to unidentified source information as unreliable and asks that it be removed from the report.

11.     Page 10, ¶¶ 49-52:  Mr. Jarvis indicates that the individual believed to be CS3 had very little involvement in the DTO and handled significantly less money than alleged.  Mr. Jarvis did not use residences in which he lived as stash houses for obvious reasons. He frequently visited his mother in Arizona, a Tucson resident prior to her death, without doing any business for the DTO. Mr. Jarvis objects to the unidentified source information as unreliable and requests that it be taken out of the report.

12.     Page 11, ¶ 54:  The Defendant requests that the PSR add that at the time of this incident, his daughter was over age 18 (DOB: July 23, 1986).

13.     Page 11, ¶ 57:  By agreement of the Parties, this paragraph should be excised from the report.

14.     Page 12, ¶ 64:  There are legal procedures which allow individuals from whom cash is seized to attempt to retrieve it.  Mr. Jarvis' assistance to his daughter in abiding by a federal statute should not be considered part of the offense conduct, and such reference should be removed.

15.     Page 14, ¶¶ 70-72:  By agreement of the Parties, these paragraphs should be excised from the report.  It should be noted that the entire page is a discussion of merely 22-24 pounds or 10-11 KG.

16.     Page 15, ¶ 77:  By agreement of the Parties, the last two sentences of this paragraph should be excised from the report.

17.     Pages 15-16, ¶ 78:  By agreement of the Parties, the last three sentences of this paragraph should be excised from the report.

18.     Page 16, ¶ 79:  By agreement of the Parties, the last three sentences of this paragraph should be excised from the report.

19.     Pages 16-17, ¶ 80:  The Defendant requests that the last sentence of this paragraph be excised.  It is an interpretation by agents which is believed to be inaccurate and the Parties have agreed to the removal of similar agent interpretations.  AUSA Braun agreed to look into and possibly amend the information in this paragraph.

20.     Page 17, ¶ 81:  Mr. Jarvis objects to the inference that the conversation was about money owed to suppliers of marijuana which is not accurate, and requests the excision of the three sentences which precede the final sentence. This part of the conversation between Mr. Jarvis and CW8 concerned a large gambling debt CW8 owed to a Las Vegas casino which intended to press criminal charges against CW8 if the debt was not paid by the date noted in the paragraph.

21.     Pages 17-18, ¶ 83:  By agreement of the Parties, everything other than the first and last sentences should be excised from the report.  However, the paragraph, with or without the excisions, is barely relevant to the sentencing decisions the Court must make and can be excised as immaterial.

22.     Page 18, ¶ 84:  The Defendant objects to all the words contained in parentheses and requests them excised as interpretations by agents; as previously noted, most such interpretations are to be removed by agreement of the Parties.

23.     Page 18, ¶ 86:  By agreement of the Parties, the final words of the paragraph, in parentheses, is amended to read "referring to bale numbers of marijuana."

24.     Page 18, ¶ 87:  Mr. Jarvis objects to the inference that Ms. Cannant was not legitimately leasing the property, as she had a lease which required her to pay rent to Mr. Jarvis while she stayed at the Bernalillo house.

25.     Page 19, ¶ 88:  The Parties agree that the words: "As discussed below" should be added at the beginning of the paragraph.  The Defendant further requests that the second sentence be amended to commence with the words: **"The government believes that."**

26.     Page 19, ¶ 90:  The discovery shows that 202 (not 205) pounds were seized and that CW1's debrief indicates he worked for the DTO for only 18 months.

27.     Page 20, ¶¶ 93-95:  The Parties have agreed that the first sentence of ¶ 95 should be excised from the report.  The Defendant requests that the entire ¶ 95 be removed.  ¶¶ 93-95 suffer from cooperating witness unreliability, specifically CW1's unreliability, as explained in detail above at ¶ 5 of these Objections.

These paragraphs are examples of why cooperating witness testimony may not meet the requirements of reliability mandated by due process.  ¶ 88, which is supported by documentation, shows that a co-defendant purchased the aircraft with the identified tail number in his own name, demonstrating the unreliability of this cooperating witness.  Dana Jarvis did not own said airplane and there is no evidence that it was purchased on his behalf.  CW1's *belief* in that regard is irrelevant and not based in verifiable fact.  Similarly, there is no question but that Mr. Jarvis did not "place everything he owned in nominee names."  In fact, almost all his property was in his own name, including the

Mora, Santa Fe and Bernalillo properties, Club Rhythm and Blues, and its business and liquor licenses, bank accounts, cellular telephones, etc. The Club generally grossed $350,000 per annum and made a small net profit. No seizure or information found in the ledgers supports the claim that "most [jobs CW1 did for the DTO] averaged 2,000 pounds of marijuana." To the contrary, the evidence shows they averaged just over 10% of that number. CW1's information is clearly contradicted by documentation and other evidence, is unreliable and should not be accepted by the Court in determining the guidelines and a reasonable sentence.

28.     Page 20, ¶ 96: By agreement of the Parties, the sentence after the parenthetical should be excised and the next sentence should be amended to read: "CW1 explained that Dana Jarvis used the money to continually purchase marijuana and also used it to purchase methamphetamine." Mr. Jarvis disagrees with the accuracy of the paragraph based on CW1's unreliability as previously described above.

29.     Page 21, ¶ 101: By agreement of the Parties, the words in parentheses should be excised from the report.

30.     Page 22, ¶ 102: The Parties agree that Mr. Jarvis never mentioned the individual named in the paragraph using his last name on the telephone to anyone. They further agree that the words: "**identified by agents as**" should be added between the words "major marijuana distributor" and the individual's name. The accuracy of the balance of the information is questioned as it is based on information from an unreliable cooperating co-defendant.

31.     Page 22, ¶ 103: Mr. Jarvis denies discussing marijuana in any manner with David Reid or telling CW15 that he did. He doubts that CW17 was "frantic"

regarding the wrapping of bulk marijuana, as they both knew that all DTO employees carefully re-wrapped all product to be transported in a manner which would defeat detection.

32.     Page 22, ¶ 104:  Mr. Jarvis denies being on the flight in question and states that to his knowledge, CW3 never went to Bloomington.  CW3 claims that there was 150-200 pounds of marijuana on board, but only accounts for 104 pounds.

33.     Page 22, ¶ 105:  Mr. Jarvis denies telling CW12 "we have a request that things be packaged in suitcases."  Indeed, this would be a strange thing for him to say, as the DTO had packaged bulk marijuana in duffle bags and suitcases for years.  It is believed that the inclusion of this statement in its version of the offense is based on the government's desire to inculpate Mr. Reid in the DTO's activities.  Further, all experienced pilots perform safety checks to ensure the weight and balance of their plane's contents are appropriate for flight.  In any event, if accurate, this information is barely relevant to the court's determination of a reasonable sentence and if inaccurate, as the defendant believes, it is not relevant at all.  It appears that there were multiple sources for the information on this page, some of which is contradictory and much of it inaccurate, and may come from unreliable and/or unidentified sources.  In fact, Mr. Jarvis characterizes the entire page 22 of the report as factually "all mixed up."

34.     Page 23, ¶ 109:  The United States agrees that the words beginning "then when we went outside" and ending in "we did nothing to deserve this" should be excised and may re-write the entire paragraph. Mr. Jarvis requests the entire paragraph be excised from the report as failing to meet the minimal due process requirements of reliability. Mr. Jarvis disputes the veracity of the story told by "Merk."  Neither the PSR nor the

United States provides any information about this declarant - not his name, whereabouts or background. Consequently, the Court has no knowledge of any prior criminal record, mental condition, negative reputation in the community, motivations or history of substance abuse, the commonly used indices of reliability against which one determines a declarant's credibility. *See also Hawkins*, 915 F.2d 1573 (6th Cir. 1990)("Table case," unpublished)("Without good cause shown for the non-disclosure of the source's identity and sufficient corroboration by other means", the Court cannot consider out of court declarations by unidentified sources).

35.     Page 24, ¶ 111:  The Defendant states that the 1.7 pounds was Manuel Gil's personal "stash."  Gil admits to smoking 12 marijuana cigarettes per day (*see* PSR ¶ 131), which tends to corroborate this. The Defendant objects to the parenthetical as inaccurate and requests it be removed.

36.     Page 25, ¶ 115:  The Defendant requests the paragraph be excised from the report as unreliable, violative of his due process rights. It contains CW17's version of an incident she learned only through "Merk" and "Batman," both of whom are unidentified alleged sources of supply.  They have not been indicted as members of the conspiracy and their reported words do not meet the requirements for evidentiary admission as double and uncorroborated hearsay from an unidentified source. *See also United States v. Wolf*, 839 F.2d 1387, 1392-96 (10th Cir. 1988)(explaining non-conspirator hearsay admissibility).

37.     Page 25, ¶ 116:  By agreement of the Parties, this paragraph should be excised from the report.

38.     Page 25, ¶ 117:  The United States has agreed to provide the call numbers

of the intercepted conversations upon which the information is based, as without knowing which conversations "revealed that bulk marijuana was transported on the plane," there is no way of verifying this information.  After the call transcripts have been reviewed, Mr. Jarvis can advise the Court of any further objections.

39.    Page 25, ¶ 118:  Since "Batman" is unidentified, this paragraph should be excised from the report as without the necessary indicia of reliability required by due process.  "Batman's" words and actions were not directed by or related to Mr. Jarvis and so has no relevance to the sentencing determinations which the Court must make.

40.    Page 26, ¶ 119:  The Parties agree that the word "stash" should be excised from the second sentence and that the paragraph should be corrected to show that the figures 298 and 173 refer to grams and the figures 3x7 and 4x7 refer to the size of the baggies in which the grams of marijuana were stored.  Subtracting 114 grams (1/4 pound of marijuana for CW17) leaves 184.  The 173 figure was what remained after "Smiley" and "Josh" each obtained small amounts.

41.    Page 26, ¶ 120:  Mr. Reid was a flight instructor who sometimes had a student pilot aboard.  The person referred to in as the co-pilot was actually a student.  Mr. Jarvis denies that he would ever leave bulk cash or marijuana in the sole custody of a stranger, as described.  The luggage loaded onto the plane from the Durango contained Mr. Jarvis' clothing and personal items.

42.    Page 26, ¶ 121:  The Parties agree that the paragraph should be amended to read: "[CW3] would testify that **he believed** the U-haul picture box…," as the Defendant disputes that U-Haul picture boxes would or could ever be acceptable containers for transporting bulk marijuana; they are very narrow and even the smallest

bales could never fit. Only the debrief of CW3 supports the allegation that marijuana was transported on the plane, as surveilling agents did not see, search or seize any marijuana or cash.  CW3's veracity is suspect for the reasons noted above and due process requires a specific finding of his credibility or the paragraph should be removed.

43.     Page 26, ¶ 123:  The Parties agree that the words "**hiding in a back bedroom"** at the end of the first sentence should be excised from the report. The information in this paragraph is incorrect, and even after the correction, should be amended to include the following accurate recitation of the arrest events:

Mr. Jarvis states that no one was hiding at the time of their early morning arrests. Lloyd Montoya was asleep in the enclosed rear porch which was used as a guest bedroom.  Mary Cannant was in her room, also asleep.  Mr. Jarvis and Cheri Lukaks were asleep in Mr. Jarvis' room.  All were awakened when a government helicopter dropped agents on the roof of the house.  Both the front gate and the front porch were unlocked; Mr. Jarvis' bedroom door faces the porch and the agents knocked, announced themselves and demanded entry.  The defendant asked for a second to put on his trousers, and was denied.  As he opened the door, two agents, with firearms drawn, who were pushing on the door, actually fell into the room on top of each other and as a result, could easily have shot and injured the defendant and/or each other.   All Parties inside the home were cooperative, including Mr. Jarvis.

44.     Page 27, ¶ 125:  This paragraph should be corrected to accurately reflect the amounts depicted in the ledgers. The Defendant disputes the agents' interpretation of the ledgers as noted in the PSR. Because marijuana seasons straddle two years, commencing in October/November and ending in May/June, it is believed that the agents

counted two seasons as one.  The seasons were separated by lines drawn in the ledger book, which apparently was unknown by the agents.  The ledger contains descriptions of some jobs from the prior season (2003-04).  A detailed review of the ledger  located at the Bernalillo house shows a total of 11 jobs in the DTO's final season of 2004-05, involving the following amounts (in pounds) per job:  234.15; 930.10; 201.40; 199.70; 308.10; 90.36; 252.08; 224; 218.35; 284.95; 288.15, for a total of 3131.44 pounds, or 1423.38 kilograms, rather than the 8000 pounds or 3600 kilos as stated in the report.  The United States has agreed to identify the persons who provided the information in this paragraph so their credibility can be examined.

45.     Page 27, ¶ 126:  The Defendant objects to the implication that Mr. Reid was an employee of the DTO.  He, along with other co-defendants who have pleaded not guilty, is presumed innocent; the government believes otherwise, and at some point, a jury will make that determination based on admissible evidence.  The paragraph itself states that while Mr. Jarvis kept a certain manner of ledger documentation for "all" the DTO's employees, no records were found for Mr. Reid. To presume his guilt in an objective report about Mr. Jarvis' criminal conduct is inappropriate and irrelevant.

46.     Page 28, ¶ 134:  CW1 claims his first job for the DTO was in December 2002, and he was arrested with a load in May 2005, a period of less than 3 ½ years.  Mr. Jarvis states that CW1 first job was in late 2003, and he worked for the DTO for about a year and a half, a figure adopted by CW1 in another statement to law enforcement.  There are numerous additional contradictions located in CW1's various statements to the authorities.  His credibility issues are described above.

47.     Page 29, ¶135:  The Defendant again denies that the Bernalillo house was

used as a stash house and so objects.

48.    Page 29, ¶ 136:   The last two sentences do not relate to the offense conduct and should be removed.

49.    Page 30, ¶ 141:  The information in this paragraph is unreliable and should be excised. CW5 was previously convicted of several serious drug offenses and when arrested 18 firearms were found in his possession.  CW5's plea agreement reflects that he was not subjected to the enhanced penalty for a second or subsequent drug offense, nor has he or will he be charged with the 18 legitimate felon in possession counts supported by the facts of weapons seizures.  One can reasonably infer that he provided information desired by the government, whether true or not, in order to avoid the far more serious penalties he would otherwise face.  Mr. Jarvis disputes his veracity.

50.    Page 30, ¶ 143:  The Court should determine that this information is unreliable and excise this paragraph. In 2003 and half of 2004, CW17 was underage and legally unable to rent houses for the Defendant as described.  There is no evidence of her use of identification misstating her age, nor is there any documentation of such rentals. In addition, the Defendant was not in the habit of giving large amounts of cash to his teenage daughter who had a substance abuse problem.

51.    Pages 30-31, ¶144:  Mr. Jarvis knows of no one named Lucy and denies that Mary Cannant ever counted money, although she may have been present while money was being counted.

52.    Pages 31-32, ¶¶ 145-149:   The Defendant maintains that CW7 is a notorious liar who falsely claimed to own the Club and that all of his statements must be meticulously scrutinized to meet due process reliability standards.  It is patently absurd

for CW7 to state that he knew good quality marijuana but didn't smoke it.  Mr. Jarvis disputes the claim that CW7 advised him that the weights on the bales were different from the actual weights or that he performed the tasks he claims for the DTO.  The Defendant did not begin dating "Q" until 2003.  Most of CW7's claims are exaggerated or made up; he is not listed as a witness.  Apparently his expenses have been paid by the government since his cooperation began, giving him a powerful motive to provide the government with whatever they appeared interested in, whether or not valid.

53.     Page 32, ¶¶ 150-152:  CW8 has a serious prior felony drug conviction, and was one of the DTO's sources of supply; in other words, he was further up the "food chain" in this operation than was the Defendant.  He was involved in numerous drug trafficking conspiracies and supplied other DTOs and is related to law enforcement officers on both sides of the Arizona/Mexico border. Other than his word, there is no evidence that he supplied the DTO with the amounts of marijuana claimed. Indeed, the government has acknowledged that Mr. Jarvis was not involved with the DTO for several years in the 1990's and CW8 was in custody for 4 years during the same time frame; Mr. Jarvis states that CW8 did not supply the DTO until the 1999-2000 season. CW8 has strong motivation to provide information, whether true or not, which is desired by the government in order to successfully reduce the penalty his own culpability.  Information the government wants to hear is frequently viewed by experienced criminals with previous incarcerations as desirable to provide. No prior serious drug conviction enhancement notice was filed in CW8's case, significantly limiting his jail exposure, another indication of information bargaining between the United States and CW8.

54.     Pages 33-34, ¶¶ 153-158:  The Parties agree that the CW numbers for

these individuals are incorrect and the information contained is inaccurate and confused. The United States has agreed to confer with the Probation Officer to correct and revise these paragraphs. Mr. Jarvis reserves his right to object to any revised paragraphs.

55.    Pages 34-35, ¶¶ 159-166:  These paragraphs reflect CW17's statements and it is requested that this section be removed in its entirety. It is neither necessary nor appropriate to include a daughter's proposed and currently unneeded statements against her father in this report. Provided the plea is neither withdrawn nor rejected, there will be no need for the presentation of such testimony. Mr. Jarvis, who maintains an excellent relationship with this daughter, insists that a significant portion of this section is made up and/or exaggerated. For example, it is virtually impossible to believe that anyone can accurately recall conversations they had at age 3 or 4, or that such a young child would understand or even pronounce "wholesale commoditist" as alleged. It is clear from her living arrangements that she was not involved in the conspiracy for fifteen years (which commenced when she was age 4, well before she could have legal culpability for any crime), although she was so charged.

In order for her to obtain the plea she ultimately accepted, she was required to make statements against her father, whom she loves. Mr. Jarvis, who loves his daughter unequivocally, states that he did not involve her in his criminal activity prior to her 18th birthday. She was immature and irresponsible and he ran a relatively tight ship. She certainly learned of and observed her father's activities, but, aside from using marijuana as a teenager, did not participate in the DTO while underage. It appears that she had developed her own sources of supply before she turned age 18, but such activities were not directed by Mr. Jarvis or associated with the DTO. Indeed, the first date noted in the

PSR on which she appears to be working for the DTO is in October, 2004, some months after her 18th birthday (¶ 54). Any mention of her being involved earlier than that date is by unreliable individuals guessing about dates many years before their statements, and oftentimes, their involvement, occurred.

The Defendant denies ¶ 160 as inaccurate-others were wrappers, not CW17. Nor did she pick up bulk marijuana (¶ 161), or supply him with marijuana (¶ 162) at age 17. Instead, she correctly describes activities that she had come to know about, but did not participate in. ¶ 163 seems to be a description of her own activities; it does not describe, as it implies, regular activity that occurred under the direction of the Defendant. Mr. Jarvis denies the allegations in ¶ 164 as entirely untrue. It was CW17 whose sources were "Merk" and "Batman." As noted in ¶ 115, their product was so bad that the Defendant purchased one bale only at his daughter's insistence, as it was not the quality he wanted. This occurred shortly before her 19th birthday.

56.    Page 35, ¶ 167: The Defendant objects to this paragraph as it is inaccurate. The reliability of this statement must be established or the paragraph should be excised.

57.    Page 36, ¶¶ 168-171: Mr. Jarvis objects to these paragraphs and requests them stricken. The defendant and CW9 were originally ski buddies. CW9 sold cocaine and had a serious cocaine addiction for a number of years and, as a result, was not hired by the DTO until after he stopped using and selling hard drugs. CW9's first job for the DTO involved 123 pounds of marijuana in 1996 or 1998 and thereafter CW9 handled between 50-100 pounds per year through the 2002-03 season. Any additional amounts had nothing to do with the Defendant. ¶¶ 168 and 170 are irrelevant except insofar as it shows that CW9 did not hesitate to deal in all types of drugs and had his own drug

distribution business, which goes to his credibility rather than to Mr. Jarvis' offense conduct. His debriefing shows confused and contradictory statements about his involvement with the DTO.

58.    Page 37, ¶ 172:  It is requested that the amount of the check, $1350.00, be noted in the paragraph.

59.    Page 37, ¶ 173:  The Parties agree that the amount of money allegedly laundered is wrong.  The dollar figure must be removed or corrected.  Additionally, the Defendant disagrees with the amount of marijuana alleged to be involved and with the figure determined by the government to be the gross proceeds of the DTO.  The grand jury transcripts reflect that the calculations are based on the case agent's speculative testimony of the DTO selling the same amount of product for the same price as the 2003-5 ledgers indicate across the fifteen year duration of the conspiracy.  Mr. Jarvis was not involved in the DTO for several years in the 1990s.  It is an economic given that the price of marijuana was less in 1990 than in 2005 and that during the period of the conspiracy, sales varied. The proceeds of the operation for money laundering purposes pursuant to § 1956(a) is profits only.  *See also supra*, ¶ 5 and *infra*, ¶¶ 61-62 (discussion of drug quantities and money laundering).

60.    Page 37, ¶ 177:  A statement accepting responsibility is attached to this pleading.  Further, the details of the DTO operations provided in this pleading evince the Defendant's acceptance of personal responsibility for his criminal conduct.

61.    Page 38, ¶ 179:  Mr. Jarvis objects that the figure of 30,000 kilos is inaccurate and that the inaccurate drug quantity yields an inaccurate base offense level. The accurate base offense level is 34. As noted in ¶ 42, p. 17 above, the correct total for

the 2004-05 season was 3131 pounds. Mr. Jarvis's recollection of the approximate amounts (in pounds) of marijuana for each season is: 1990-1: 700 each year; 1992-94: 0; 1995: 700; 1996-98: 1200 each year; 1999-2001: 2000 each year; 2002: 2800; 2003: 4000: 2004: 3131 for a total of approximately 19,631 pounds or approximately 8,923 kilograms (KG). Level 34 applies to at least 3,000 KG but less than 10,000 KG of marijuana. "When choosing between a number of plausible estimates of drug quantities, none of which is more likely than not the correct quantity, a court must err on the side of caution." *Ortiz*, 993 F.3d at 208. Here, it appears likely that Mr. Jarvis' calculations are far more plausible than found in the PSR.

62. Page 39, ¶ 180: Because the guidelines are advisory only, the application of this enhancement should only be accepted by the Court if it appears appropriate under all the facts and circumstances of this case. The total amount of gross proceeds from the DTO operations over the years was obviously large, although not nearly as large as stated, as explained above. However, gross revenue does not equate to laundered funds when the offense involves the promotion of the illegal activity; only profits do. *See also United States v. Santos*, 128 S.Ct. 2020, 2025 (2008), *and* discussion on p. 6 above. Here, Mr. Jarvis pled to only one count of non-traditional (using his own name in the transactions) money laundering of $1350.00. The total alleged across the three similar counts totals merely $2750.00. The other money laundering counts which name the Defendant were mortgage payments. *See ¶* 5, at p.6 above. The nature of these payments is such that it would be a stretch to claim them as evidence of laundered money from the DTO's profits. The balance of the money laundering counts involve merely $2750.00 and are all paid to Mr. Jarvis in his own name. These payments cannot be described as

traditional money laundering, as they are not hidden in any manner and are so insignificant as to be described as *de minimus*.  U.S.S.G. §2S1.1(b)(2)(B) merely states that a two point enhancement should be applied to anyone whose offense is pursuant to 18 U.S.C. § 1956(a), without further explanation as to why in the guideline or in the application notes.  To increase a sentence by between 62-112 months at level 41 or 42-52 months at level 35, without any apparent reason other than the conviction for which the Defendant is already being punished, clearly appears to be "greater than necessary" to achieve the statutory goals.  18 U.S.C. § 3553(a).  Increases of more than 3-9 years under the facts and circumstances of this case would be unreasonable.  Mr. Jarvis respectfully requests the Court to reject this enhancement as unjustified and excessive.

63.    Page 39, ¶ 185:  Pursuant to the Defendant's calculations described above, the correct adjusted offense level is **38**.

64.    Page 39, ¶ 187:  Based on the above calculations, the correct total offense level is **35.**

65.    Page 40, ¶ 189:  The Parties agree that the correct sentence was one year probation.

66.    Page 41, ¶ 193:  The Defendant was arrested in New Mexico, but the allegation stemmed from an Indictment in South Carolina.  These charges were dismissed prior to trial.

67.    Pages 41-42, ¶ 194:  Mr. Jarvis requests that this paragraph be excised from the report as unreliable. There is no record of such an arrest.  It is presumed that the NCIC information was inaccurately entered.

68.    Page 42, ¶¶ 195, 196:  Mr. Jarvis requests the section be re-titled "Other

Arrests." Motor vehicle violations should not considered criminal conduct.

### Offender Characteristics

18 U.S.C. § 3553 requires that defendants be sentenced based on *both* the nature and circumstances of the offense *and* the history and characteristics of the defendant. It is black letter law that both the Constitution and statutes trump the advisory Guidelines. *United States v. Booker*, 543 U.S. 220 (2002). Despite statutory and case law mandates to consider each defendant as an individual with a unique history, this report contains three and a half pages about the history and characteristics of the Defendant and some 29 pages of offense conduct. Mr. Jarvis requests that the report reflect all aspects of his life.

Reported at the interview but not mentioned in the PSR, for example, is that Dana Emerson Jarvis is a direct descendant of Ralph Waldo Emerson on his mother's side. His father was a WW II fighter pilot in the Navy who worked for the United States after the war in a top secret position. The information which is in the PSR is repeatedly described as "reportedly," inferring that verified information gleaned directly from the Defendant about his own life may be inaccurate. When comparing the treatment of the non-offense related aspects of Mr. Jarvis' life with the acceptance of the offense information derived from the government and its reports, including information from totally unknown individuals and those with clear motivations not to provide the truth, the PSR, as it currently stands, is objectively unfair and not in compliance with the law. The report will have a significant effect on the Defendant's future and should be as accurate and complete as possible.

Consequently, it is requested that all "reportedly" language be excised and that the additional and corrected information in this pleading be added to the PSR. It should

not be forgotten that it is a person being sentenced and deprived of his various liberties, who is, based on our shared humanity, entitled to respect and fairness.  Mr. Jarvis has accepted full responsibility for his admitted criminal behavior with a clear recognition of the reason for and purposes of his sentence and the Court has the obligation to receive as much information as he wishes to make available about all aspects of his history and characteristics. 18 U.S.C. § 3661.

69.  Page 42, ¶ 198:  The Defendant's sister's name is spelled "Lynne."

70.  Pages 43-44, ¶ 202:  These paragraphs are a misinterpretation of Mr. Jarvis' statement to Probation and require correction. Mr. Jarvis and Ms. Kerwin are not "estranged."  More accurately, they are out of contact as all co-defendant's conditions of release mandated no contact with co-defendants.  Mr. Jarvis in fact calls their daughter's grandfather monthly to keep apprised of the child's life progress and news.  Both parents agreed that taking the young child to see the Defendant in custody at her age, currently 4 years old, would be inappropriate and, via third parties, continue to make co-parenting decisions about their daughter.

71.  Page 44, ¶ 205:  Mr. Jarvis has a heart condition which resulted in his being hospitalized on an emergency basis during his incarceration at TCDC.  He has seen a cardiologist at least twice since but had difficulty obtaining regular blood pressure checks since the hospital visit until several weeks ago when counsel spoke with TCDC's Deputy Warden.  His blood pressure has been measured at a much higher rate than prior to his incarceration.  Both his parents died of heart related conditions and his father died shortly after his retirement, concerning to the Defendant who is currently age 59.  Mr. Jarvis has a serious eye problem, possibly macular degeneration, which causes significant

loss of vision with a potential for blindness. He has not been provided any optometry care while in pre-trial incarceration.

Mr. Jarvis also suffers from dental problems causing some difficulty in eating. He had been in the process of completing a transition to dental implants when arrested and the dental work has languished uncompleted for the past 3.5 years. The combination of the incomplete dental work and incarceration diet has quickened the degeneration of Mr. Jarvis' health. He was accustomed to a healthy diet prior to his incarceration and states that he has had only three pieces of fresh fruit since his arrest.

72.    Page 44, ¶ 206:  Since Mr. Jarvis' incarceration, his ability to concentrate has diminished, and his anxiety about himself and his family has substantially increased.

73.    Page 44, ¶ 207:  The Defendant objects to the suggestion that he needs substance abuse treatment. He has one misdemeanor conviction for DWI 11 years ago and one other DWI arrest over a period of twenty years (the third listed arrest is denied; *see* ¶67 above). Mr. Jarvis has been in custody for the last 3.5 years and will be in custody for almost another decade.   In light of his unique and extended pre-trial incarceration, there are no current or anticipated substance abuse issues requiring the imposition of sentence conditions.

74.    Page 45, ¶¶ 208-210:  The sentence "The defendant advised of no other formal education or training" requires amendment. Mr. Jarvis has earned several certifications while currently incarcerated and copies of same will be provided to Probation upon receipt.  The PSR fails to note that his high school grade point average is the equivalent of a B+, and he requests this be included.

75.    Page 45, ¶¶ 211-212:  Mr. Jarvis is a certified legal video specialist. He

owned and operated a legitimate video production business in Santa Fe for five years in the 1990's and has worked in that capacity for various governmental agencies, the Vietnam Veterans of America and the Native American community.  His 1994 video made for the VVA about Veterans' health care won a national award.

76.     Page 45, ¶ 214:  The lien was a clerical mistake by the IRS and several years ago was resolved by Mr. Jarvis' bookkeeper and the IRS with the dissolution of the lien.  There was no request for tax returns, copies of which are believed to be in the United States Attorney's office. There is a release of information form which all defendants facing sentence are asked to sign.  Counsel has crossed out the release request as to IRS only in every case she has handled in the last 15 years, and did so in this case.

77.     Pages 46-47:  The Mora property has been signed over to an irrevocable trust in favor of the Defendant's two older children, pursuant to the plea agreement.  The $124.00 debt has now been paid.  His net worth is therefore $0.  From his approved trust fund (*see* ¶ 214, p. 47 of PSR) Mr. Jarvis pays $400.00 month support for his younger daughter, $450.00 monthly support for his son, pays $50.00 monthly for his nephew, and sends his older daughter what he can monthly.  He has also pre-paid the mandatory special assessment.  This shows a man who understands and fulfills his legal and moral financial obligations even while in custody.  This information reflects socially positive attributes of the Defendant and should be in the PSR.

78.     Page 47, ¶ 215:  The words "will be" should be amended to "has been."

79.     Page 48, ¶ 218:  The total offense level pursuant to the PSR calculations is 41.  The guideline range noted is accurate for level 41.  However, the Defendant believes that the reliable information in the discovery and his own knowledge of the events

correctly result in a total offense level of 35.  Level 35, criminal history category I, yields a guideline range of 168-210, the low end of which is the agreed upon sentence.  As such, the sentence envisioned by the plea agreement and accepted by the Defendant is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing (18 U.S.C. § 3553(a)) and objectively reasonable under the guidelines.

80.    Page 50, ¶ 233:  Mr. Jarvis asks that there be no denial of federal benefits. This is crucial as Mr. Jarvis will be approaching 70 years of age upon his release and will need the social and economic supports of any available programs.

81.    TCDC Deputy Warden Rodriguez advised undersigned counsel that Mr. Jarvis is an excellent inmate who has had no rule violations or write-ups during his lengthy stay there.  He is a hard worker, who assists both staff and fellow inmates.  It is requested that this information be added to the PSR.

82.    Attachment A, page 3:  The proposed special condition of no contact with most co-defendants is unnecessary.  The Defendant has no desire for contact with those co-defendants and others who agreed to testify against him and welcomes this condition for those individuals.  However, there appears to be little reason why he should not, for example, have contact with his Cathy Fitzgerald, his former sister-in-law and mother of his nephew whom he helps support.  It is respectfully suggested that the condition be amended to require no contact with co-defendants and other witnesses or sources who cooperated with the government, while allowing contact with the remaining co-defendants, his daughter and his former sister-in-law.

Respectfully submitted,

JUDITH A. ROSENSTEIN
P.O. Box 25622
Albuquerque, NM 87125-5622
(505) 379-1289 (telephone)
(505) 797-8086 (facsimile)
jrosenstein7@cybermesa.com


ELECTRONICALLY FILED
_____
Judith A. Rosenstein
Attorney for Defendant




JODY NEAL-POST
Attorney for Defendant
317 Amherst Dr. SE
Albuquerque, NM 87106-1403
(505) 268-7263 (telephone)
(505) 255-2782 (facsimile)

GARY C. MITCHELL
Attorney for Defendant
P.O. Box 2460
Ruidoso, NM 88355-2460
(575) 257-3070 (telephone)
(575) 257-3171 (facsimile)

I hereby certify that a true copy of
this pleading was sent to AUSA
James Braun via electronic filing and
to USPO Anthony Galaz via e-mail
on this 6th day of February, 2009.


ELECTRONICALLY FILED
_____
Judith A. Rosenstein